USCA1 Opinion

 

 August 17, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1896 UNITED STATES, Appellee, v. KENNETH INNAMORATI, Defendant, Appellant. ___________________ No. 91-1897 UNITED STATES, Appellee, v. WILLIAM THOMPSON, Defendant, Appellant. ___________________ No. 91-1898 UNITED STATES, Appellee, v. JAMES GRADY, a/k/a THE REBEL, Defendant, Appellant. ____________________ No. 91-1899 UNITED STATES, Appellee, v. ROBERT DEMARCO, SR., Defendant, Appellant. ____________________ No. 91-1900 UNITED STATES, Appellee, v. WILLIAM LETTERS, Defendant, Appellant. ____________________ No. 91-1901 UNITED STATES, Appellee, v. ROBERT DEMARCO, JR., Defendant, Appellant. ____________________ No. 91-1902 UNITED STATES, Appellee, v. PHILLIP BARGALLA, a/k/a FLIP, Defendant, Appellant. ___________________ No. 91-1903 UNITED STATES, Appellee, v. JAMES LITTERIO, a/k/a MICKEY, Defendant, Appellant. ____________________ No. 91-1924 UNITED STATES, Appellee, v. JOHN BOISONEAU, Defendant, Appellant. ____________________ No. 92-1253 UNITED STATES, Appellee, v. JOSEPH GILBERTI, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of the Court issued on June 17, 1993, is amended as follows: On page 30, lines 1-2 of the fourth paragraph of the block quote, replace "Paula Bufton" with "Paula [sic] Bufton". July 8, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1896 UNITED STATES, Appellee, v. KENNETH INNAMORATI, Defendant, Appellant. ____________________ No. 91-1897 UNITED STATES, Appellee, v. WILLIAM THOMPSON, Defendant, Appellant. ____________________ No. 91-1898 UNITED STATES, Appellee, v. JAMES GRADY, a/k/a THE REBEL, Defendant, Appellant. ____________________ No. 91-1899 UNITED STATES, Appellee, v. ROBERT DEMARCO, SR., Defendant, Appellant. ___________________ ____________________ No. 91-1900 UNITED STATES, Appellee, v. WILLIAM LETTERS, Defendant, Appellant. ____________________ No. 91-1901 UNITED STATES, Appellee, v. ROBERT DEMARCO, JR., Defendant, Appellant. ____________________ No. 91-1902 UNITED STATES, Appellee, v. PHILLIP BARGALLA, a/k/a FLIP, Defendant, Appellant. ____________________ No. 91-1903 UNITED STATES, Appellee, v. JAMES LITTERIO, a/k/a MICKEY, Defendant, Appellant. ____________________ No. 91-1924 UNITED STATES, Appellee, v. JOHN BOISONEAU, Defendant, Appellant. ____________________ ____________________ No. 92-1253 UNITED STATES, Appellee, v. JOSEPH GILBERTI, Defendant, Appellant. ____________________ ERRATA SHEET ERRATA SHEET The opinion of the Court issued on June 17, 1993, is amended as follows: On page 44, lines 14-16: replace the sentence "Although the notation was produced prior to the cross-examination of Scott, counsel for Grady declined to ask Scott any questions." with the sentence "Grady sought to call O'Brien to the stand to question him about the _______ notation, but he never sought to recall Scott for further cross- examination once the notes were produced." June 23, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1896 UNITED STATES, Appellee, v. KENNETH INNAMORATI, Defendant, Appellant. ____________________ No. 91-1897 UNITED STATES, Appellee, v. WILLIAM THOMPSON, Defendant, Appellant. ____________________ No. 91-1898 UNITED STATES, Appellee, v. JAMES GRADY, a/k/a THE REBEL, Defendant, Appellant. ____________________ No. 91-1899 UNITED STATES, Appellee, v. ROBERT DEMARCO, SR., Defendant, Appellant. ___________________ ____________________ No. 91-1900 UNITED STATES, Appellee, v. WILLIAM LETTERS, Defendant, Appellant. ____________________ No. 91-1901 UNITED STATES, Appellee, v. ROBERT DEMARCO, JR., Defendant, Appellant. ____________________ No. 91-1902 UNITED STATES, Appellee, v. PHILLIP BARGALLA, a/k/a FLIP, Defendant, Appellant. ____________________ No. 91-1903 UNITED STATES, Appellee, v. JAMES LITTERIO, a/k/a MICKEY, Defendant, Appellant. ____________________ No. 91-1924 UNITED STATES, Appellee, v. JOHN BOISONEAU, Defendant, Appellant. ____________________ ____________________ No. 92-1253 UNITED STATES, Appellee, v. JOSEPH GILBERTI, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of this Court issued on June 17, 1993, is amended as follows: On third page under list of attorneys "Levchuck should read ________ Levchuk." _________ UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1896 UNITED STATES, Appellee, v. KENNETH INNAMORATI, Defendant, Appellant. ____________________ No. 91-1897 UNITED STATES, Appellee, v. WILLIAM THOMPSON, Defendant, Appellant. ____________________ No. 91-1898 UNITED STATES, Appellee, v. JAMES GRADY, a/k/a THE REBEL, Defendant, Appellant. ____________________ No. 91-1899 UNITED STATES, Appellee, v. ROBERT DEMARCO, SR., Defendant, Appellant. ___________________ ____________________ No. 91-1900 UNITED STATES, Appellee, v. WILLIAM LETTERS, Defendant, Appellant. ____________________ No. 91-1901 UNITED STATES, Appellee, v. ROBERT DEMARCO, JR., Defendant, Appellant. ____________________ No. 91-1902 UNITED STATES, Appellee, v. PHILLIP BARGALLA, a/k/a FLIP, Defendant, Appellant. ____________________ No. 91-1903 UNITED STATES, Appellee, v. JAMES LITTERIO, a/k/a MICKEY, Defendant, Appellant. ____________________ No. 91-1924 UNITED STATES, Appellee, v. JOHN BOISONEAU, Defendant, Appellant. ____________________ ____________________ No. 92-1253 UNITED STATES, Appellee, v. JOSEPH GILBERTI, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, Senior District Judge] _____________________ ____________________ Before Torruella, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ J. Michael McGuinness, by Appointment of the Court, with whom ______________________ McGuinness & Parlagreco was on brief for appellant Kenneth Innamorati. _______________________ Diane Powers, by Appointment of the Court, for appellant William _____________ Thompson. Robert L. Rossi, by Appointment of the Court, for appellant James _______________ Grady. Robert J. Danie, by Appointment of the Court, with whom Bonavita, _______________ _________ Gordon, and Danie, P.C. was on brief for appellant Robert DeMarco, Sr. _______________________ Michael C. Bourbeau, by Appointment of the Court, with whom _____________________ Bourbeau and Bourbeau was on brief for appellant William Letters. _____________________ Warren R. Thompson, by Appointment of the Court, for appellant __________________ Robert DeMarco, Jr. Henry C. Porter, by Appointment of the Court, for appellant ________________ Phillip Bargalla. Arthur R. Silen, by Appointment of the Court, for appellant James _______________ Litterio. Frances L. Robinson, by Appointment of the Court, with whom ____________________ Davis, Robinson & White was on brief for appellant John Boisoneau. _______________________ Dwight M. Hutchison, by Appointment of the Court, for appellant ___________________ Joseph Gilberti. Andrew Levchuk, Assistant United States Attorney, with whom A. ______________ __ John Pappalardo, United States Attorney, and Kevin O'Regan, Assistant _______________ _____________ United States Attorney, were on brief for appellee. ____________________ June 17, 1993 ____________________ BOUDIN, Circuit Judge. In this case ten individuals _____________ challenge, on a wide variety of grounds, their convictions and sentences following a jury trial in the district court.1 All ten defendants were found guilty of conspiring to distribute and to possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. 846 and 841(a)(1). All defendants except Thompson were convicted of one or more additional counts relating to the ring's activities. For the reasons that follow, we reverse defendant Grady's conviction on one count for insufficient evidence and remand for resentencing, and we sustain each of the remaining convictions and sentences. I. BACKGROUND The voluminous testimony and other evidence properly introduced at trial, viewed in the light most favorable to the verdicts, see United States v. Rivera-Santiago, 872 F.2d ___ ______________ _______________ 1073, 1078-79 (1st Cir.), cert. denied, 492 U.S. 910 (1989), ____________ established the following facts. In 1984, Brian Fitzgerald and Paul Callahan--two co-conspirators who testified for the government at trial--met in Walpole penitentiary while serving terms of imprisonment there. The two men formed an ____________________ 1The ten are Kenneth Innamorati, William Thompson, James Grady, Robert DeMarco Sr., William Letters, Robert Demarco Jr., Phillip Bargalla, James Litterio, John Boisoneau, and Joseph Gilberti. -14- -14- alliance, agreeing that upon their release from prison they would begin a drug distribution network. After their release, Callahan and Fitzgerald began drug dealing. In 1985, they were approached by an intermediary and asked if they could supply a kilogram of cocaine to Kenneth Innamorati and his then-partner, Noel Bouvier. Fitzgerald and Callahan agreed to supply the cocaine, which they acquired from a source in Everett, Massachusetts, and then delivered to Innamorati in Framingham in exchange for $55,000. About three months later, Fitzgerald and Callahan agreed to join forces with Innamorati and Bouvier. At that time, Innamorati's principal source for cocaine was an individual in Boston. Callahan and Fitzgerald each picked up kilograms of cocaine from the supplier and delivered it to Innamorati, who weighed it, mixed it with other substances to increase its volume, and separated it into smaller quantities. Callahan and Fitzgerald then delivered the drugs to Innamorati's customers. After a time, Innamorati lost the services of his Boston supplier, and Callahan began supplying Innamorati with cocaine from Callahan's own sources. Callahan made contact with an individual named Tom Reilly in Florida. Reilly ultimately supplied Callahan and Innamorati with large quantities of cocaine and marijuana on a regular basis from the summer of 1985 onward. In June 1985, Fitzgerald hired -15- -15- defendant Grady, who drove a tractor-trailer, to pick up the cocaine and marijuana from Reilly in Florida and haul it to Massachusetts. Grady made this trip about once a month between June 1985 and February 1988, occasionally bringing cash down to Florida to pay for prior shipments. Callahan and Innamorati developed an elaborate system for storage and distribution of the narcotics once they reached Massachusetts. The drugs were stored in several different locations. For example, some of the drugs were stashed in the trunk of a car parked in a storage unit at a self-storage facility called Hyperspace in Holliston, Massachusetts. Drugs were also stored in a rented apartment in a development called Edgewater Hills in Framingham, Massachusetts. In May 1987, a new apartment in Edgewater Hills was selected. Edward Tulowiecki, an acquaintance of Innamorati who was a star witness at trial, agreed to live in the apartment and assist Innamorati; Innamorati paid a portion of the rent for the apartment. This Edgewater Hills apartment became the base of operations for much of the conspirators' activities. Innamorati and Callahan moved a considerable array of drug distribution paraphernalia into the apartment, including scales, a safe and a freezer. Callahan and Innamorati frequently came to the apartment to deliver or pick up packages of cocaine and marijuana, or to prepare and package -16- -16- them for distribution. Tulowiecki was not permitted to have other guests in the apartment. Innamorati used beepers and cellular telephones to facilitate his distribution activities. Each of the persons to whom he regularly distributed the narcotics was assigned a code number. To place an order, he or she would place a call to Innamorati's beeper, and then enter the code number and the quantity sought; the order would then be transmitted to the digital display on Innamorati's beeper. Innamorati preferred cellular rather than ordinary telephones for communications relating to drug distribution, because he believed that cellular telephones were more difficult to tap. William Thompson, a former Clinton police officer and a friend of Innamorati, acquired and installed several cellular phones for Innamorati and registered the phones in Thompson's own company name. Innamorati distributed cocaine and marijuana to numerous individuals between summer 1985 and February 1988, including Thompson, William Letters, James Litterio, and John Boisoneau; each of these purchasers was assigned a beeper number in Innamorati's system. Callahan had a number of customers of his own during this period, including defendants Robert DeMarco Sr., Robert DeMarco Jr., Phillip Bargalla and Joseph Gilberti. Generally there was evidence that these -17- -17- persons resold portions of the cocaine they purchased from Callahan or Innamorati to others. In November 1987 Jeffrey Scott, a nephew and cocaine customer of Callahan who was also in debt to Callahan, contacted the Drug Enforcement Agency ("DEA") and provided information about Callahan's activities. This began an extensive covert investigation into the Callahan/Innamorati operation. By late February 1988 the DEA had obtained enough information to execute a series of search warrants at the Hyperspace facility, Fitzgerald's and Callahan's residences, and the Edgewater Hills apartment. At the latter site the agents found two kilograms of cocaine and 75 pounds of marijuana, as well as drug distribution paraphernalia, records of drugs transactions and a small cache of weapons and ammunition. After a 32-day jury trial conducted from September to November 1990, all ten defendants in this appeal were convicted. In addition to the common conspiracy count, all defendants except Thompson and Bargalla were convicted of one or more counts of possession of cocaine or marijuana with intent to distribute in violation of 21 U.S.C. 841(a)(1); Bargalla was convicted of the lesser included offense of simple possession. In addition, Innamorati was convicted of using a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. 924(c)(1), and of conducting a -18- -18- continuing criminal enterprise in violation of 21 U.S.C. 848. The ten defendants in this appeal raise numerous separate issues relating either to conviction or sentence. In certain instances, claims of error are made but only cursorily discussed. Where appropriate we have invoked "the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, _____________ _______ 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 _____________ (1990). Because a number of the claims overlap, we discuss them by subject. II. SEVERANCE Innamorati, Thompson, Grady, DeMarco Sr., DeMarco Jr., Bargalla, and Gilberti challenge the district court's denial of their motions to sever each of their trials from those of their co-defendants. Defendants argue that severance was necessary to protect them from prejudice and the possibility that the jury would fail to consider the evidence separately as to each defendant. Prejudice from joinder can come in various forms, including jury confusion, the impact of evidence that is admissible against only some defendants, and "spillover" effects where the crimes of some defendants are more horrific or better documented than the crimes of others. But joinder -19- -19- is normally economical--especially where defendants are charged with the same core crime--and clear instructions can often confine the risk of prejudice. Accordingly, it is settled that defendants are not entitled to severance merely because it would improve their chances of acquittal; rather, substantial prejudice "amounting to a miscarriage of justice" must be proved before a severance is mandatory. United ______ States v. Sabatino, 943 F.2d 94, 96-97 (1st Cir. 1991). We ______ ________ review the refusal of a trial court to grant a severance for abuse of discretion, United States v. Johnson, 952 F.2d 565, _____________ _______ 581 (1st Cir. 1991), cert. denied, 113 S. Ct. 58 (1992), and ____________ we find no such abuse in this case. Despite the number of defendants, there is no indication of jury confusion in this case. The government in summing up separated the evidence as to each defendant. The trial judge gave the customary instruction, emphasizing that each defendant must be judged separately based on the evidence admissible against that defendant. The jury apparently found itself capable of distinguishing: it acquitted one defendant--Thomas Agnitti, who is not a party to this appeal- -on the conspiracy count and on other counts convicted two defendants (Agnitti and Bargalla) only on lesser included offenses. Innamorati aside, none of the defendants points to any specific evidence that significantly inculpated that -20- -20- defendant but was admissible only against another defendant. Indeed, the core of the case was the alleged common conspiracy; thus, after the necessary foundation, most of the evidence of wrongdoing by one conspirator was admissible against other conspirators as well. Nor is this a case in which separable acts of an individual defendant are so disproportionately heinous that there is an arguable taint merely from the association among defendants. In sum, for everyone apart from Innamorati, this is a garden-variety joinder almost routine in drug conspiracy cases. Innamorati does point to evidence that he argues was harmful to him but properly admissible only as to another defendant, namely, the grand jury testimony of Thompson. In our view, this grand jury testimony was not admissible against Innamorati; but, for reasons discussed in part IV, we also conclude also that Innamorati is not entitled to a reversal on account of this testimony. III. SUFFICIENCY OF THE EVIDENCE Thompson, Grady, Letters, DeMarco Jr., Bargalla, Litterio and Gilberti argue that the evidence introduced at trial was insufficient to support their convictions.2 ____________________ 2Innamorati also raises this issue in his brief, but only by asserting in conclusory terms that the evidence was insufficient to establish his guilt. Ordinarily, this claim would be waived but in this instance we necessarily consider the weight of the evidence against him in part IV as part of our harmless error analysis. -21- -21- Defendants bear the heavy burden of demonstrating that no reasonable jury could have found them guilty beyond a reasonable doubt. See Rivera-Santiago, 872 F.2d at 1078-79. ___ _______________ An appellate court must view the evidence in the light most favorable to the prosecution, "drawing all plausible inferences in its favor and resolving all credibility determinations in line with the jury's verdict." United ______ States v. David, 940 F.2d 722, 730 (1st Cir.), cert. denied, ______ _____ ____________ 112 S. Ct. 605 (1991). We conclude that, with one exception, the prosecution offered evidence adequate to support the convictions. A. William Thompson Thompson was convicted of conspiracy to distribute and to possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. 846 and 841(a)(1). Conviction for conspiracy requires proof that the defendant entered into an agreement with another to commit a crime, here, an agreement with Innamorati to distribute cocaine and marijuana. United States v. Concemi, 957 F.2d 942, 950 (1st _____________ _______ Cir. 1992). This agreement need not be expressed; it "may be implicit in a working relationship between the parties that has never been articulated but nevertheless amounts to a joint criminal enterprise." United States v. Moran, 984 F.2d _____________ _____ 1299, 1300 (1st Cir. 1993). -22- -22- There was evidence--in fact, Thompson admitted in his testimony before the grand jury--that Thompson provided "registry checks" of license plates at Innamorati's request. When Innamorati became suspicious of vehicles that he thought were following him or that were being used by prospective drug purchasers, he asked Thompson, a former police officer, to run the plates through the state's computer registry. If the registry check came back "not on file" or "no response," Innamorati had reason to believe that the vehicle belonged to a law enforcement agency and was being driven by an undercover agent. Thompson also admitted that he acquired two cellular telephones for Innamorati's use which Thompson leased in his own company's name. Relying primarily on Direct Sales Co. v. United States, ________________ _____________ 319 U.S. 703, 709 (1943), Thompson argues that there was insufficient evidence that Thompson knew of the use to which Innamorati put these goods and services, or that Thompson intended that they be used in that manner. But Thompson admitted in testimony before the grand jury that he regularly purchased cocaine from Innamorati when he was employed as a police officer from 1970 to 1978. Tulowiecki testified that he regularly distributed cocaine to Thompson from Innamorati in 1987. Thompson was assigned a beeper number in Innamorati's communications network. Thompson also admitted -23- -23- that he knew that the cellular telephones he provided were to be used to "elude law enforcement." Thompson argues vehemently that he could not have been a full-fledged conspirator because he was excluded from certain locations at which Innamorati stored his drugs, and because Callahan and Fitzgerald could not identify him at trial. These facts do not defeat Thompson's membership in the conspiracy. It is black-letter law that one need not be familiar with every other person with whom he is found to have conspired, nor must he participate in the conspiracy to the same extent as all others. See United States v. Rios, ___ _____________ ____ 842 F.2d 868, 873 (6th Cir. 1988), cert. denied, 488 U.S. ____ ______ 1031 (1989); United States v. Giry, 818 F.2d 120, 127 (1st _____________ ____ Cir.), cert. denied, 484 U.S. 855 (1987). Taken as a whole, ____ ______ the evidence allowed the jury to find that Thompson was a knowing member of the drug conspiracy. B. James Grady The evidence showed that Grady brought numerous shipments of cocaine and marijuana from Florida to Callahan and Innamorati in Massachusetts. Several witnesses, including Callahan, Fitzgerald and Reilly, described in consistent detail Grady's practice of transporting the cocaine and the cash in a tool box in the cab of his tractor- trailer. There was also ample evidence that Grady knew that the shipments contained narcotics. Fitzgerald testified that he told Grady that the tool box contained cocaine. Reilly -24- -24- recounted one occasion on which Grady watched while bales of marijuana were loaded onto his truck. Evidence showed that Grady occasionally brought large amounts of cash from Massachusetts to Florida to pay Reilly. In the face of this testimony, Grady contends that the evidence was insufficient to convict him of conspiracy to distribute. He argues that Callahan and Innamorati had suppliers other than Reilly and that even as to Reilly there were other couriers in addition to Grady. He also points out that although the conspiracy allegedly continued from 1984 until November 1988, the evidence of his participation was limited to the period between June 1985 and February 1988. But Grady need not have been the exclusive courier in order to be a conspirator, nor must he have been involved in the conspiracy during the entire life of the operation. See, ___ e.g., United States v. Baines, 812 F.2d 41, 42 (1st Cir. ____ _____________ ______ 1987). We have no trouble finding the evidence adequate to support Grady's conspiracy conviction. In addition to conspiracy Grady was also convicted under counts three and four of the indictment of possession of cocaine on February 25 and 27, 1988, with intent to distribute. These were the dates on which DEA agents executed the search warrants on the Hyperspace facility and the Edgewater Hills apartment, respectively. The government's theory at trial was that Grady was guilty of -25- -25- possessing the cocaine found at these locations because he had carried that cocaine from Florida in his tractor-trailer. Although Grady was linked to the cocaine found in the Hyperspace facility, we agree with Grady that there was insufficient evidence that he ever possessed the cocaine found in the Edgewater Hills apartment. Callahan testified that he gave Grady a toolbox containing three kilograms of cocaine in Florida on February 20, 1988, and that on February 24 he retrieved the toolbox from Grady in Massachusetts and drove to the Hyperspace storage facility. The next day, the government executed the search warrant at the facility and seized exactly three kilograms of cocaine. It is difficult to see, therefore, how the cocaine seized a few days later from the Edgewater apartment could also have come from Grady's February 20 shipment. The government argues that Callahan also testified that he brought the toolbox with him to the Edgewater apartment after leaving Hyperspace. Thus, the government says, "[w]hile the evidence on [this] score may be open to dispute," that dispute was for the jury to resolve. It is true that Callahan's testimony is unclear--one cannot tell whether he stored the three kilograms at Hyperspace, or took them with him when he left there and went to the Edgewater apartment. But the testimony of Scott, who accompanied Callahan, is clear on this point. Scott -26- -26- testified that Callahan took the cocaine out of the toolbox, placed it in the trunk of the car in the Hyperspace storage compartment, and then left the facility with the toolbox, now emptied of its drugs. The testimony is also clear that only three kilograms were transported by Grady on this trip, and that exactly three kilograms were seized by federal agents a few days later from the Hyperspace facility. It is of course quite possible, indeed likely, that at least some of the cocaine found in the Edgewater apartment was a remnant of a prior shipment by Grady. But this is conjecture. The government does not advance the theory here, nor did it do so before the jury, and there was evidence of other suppliers and couriers. Accordingly, finding no evidence to support Grady's conviction for possessing the cocaine seized on February 27, we reverse his conviction on count four. This may have no effect on Grady's actual sentence, since the counts were grouped and the sentence was based on the volume of drugs foreseen; but out of an abundance of caution we remand his case to the district court for resentencing. C. William Letters Letters was convicted of conspiracy and one count of possession with intent to distribute. He argues that there was insufficient evidence to prove he that entered into an agreement to distribute narcotics. He concedes that the -27- -27- evidence showed a number of deliveries of cocaine to him from Innamorati (via Tulowiecki), in amounts ranging from nine grams to, on one occasion, as much as an ounce (28 grams). But Letters says that the evidence also showed that he was a very heavy personal user of cocaine. He argues that there is no basis for an inference that he was involved in further distribution of the drugs he acquired. Thus, according to Letters, "[t]he government's proof only demonstrated that Letters was a regular customer of Innamorati for personal use." We need not decide when and whether "a regular customer" buying for personal use could be treated as a conspirator in a drug distribution ring, see Moran, 984 F.2d ___ _____ at 1302-04, because the evidence permitted the jury to find that Letters also distributed portions of the large amount of cocaine he purchased from Innamorati. During direct examination of Tulowiecki, the following exchange took place: Q. And how did you package the cocaine for Letters? A. Well, with Bill Letters, we would take nine grams of cocaine and put in five grams of cut.[3] And I grind that all together, and it would come out to fourteen. And I would put these all into individual packages. And one, another specific package for Bill Letters himself that was pure cocaine. . . . . ____________________ 3 Various witnesses explained during trial that "cut" refers to additives that were mixed into the cocaine to increase its volume and, potentially, its resale value. -28- -28- Q. Why did [Innamorati] want you to package the cocaine this way [for Letters]? A. Because Billy Letters didn't have a scale. . . . From Tulowiecki's reference to individual packaging and to a separate package of cocaine "for Bill Letters himself," there is certainly a permissible inference that the other individual packages were destined to be resold to others. This inference is reinforced by the use of "cut" and by the large volume of cocaine that Letters acquired, shown by Tulowiecki's records to be a total of 336.5 grams of cocaine between June 1987 and February 1988. Accordingly, Letters' convictions for conspiring to distribute cocaine and for possessing cocaine with intent to distribute were supported by adequate evidence. D. Robert DeMarco Jr. DeMarco Jr. was convicted of conspiracy and possession of cocaine with intent to distribute. His challenge goes less to the quantity of the evidence in support of these convictions as to its quality. He argues that the evidence was deficient because the government did not catch him in the act, such as by recording his telephone conversations or conducting a controlled buy from him, but instead relies entirely on "weak circumstantial evidence." The evidence may not be overwhelming but it is sufficient. -29- -29- Both Callahan and Scott described repeated deliveries of cocaine to DeMarco Jr. In addition, Callahan testified that DeMarco Sr. told him that between May 1987 and February 1988, DeMarco Jr. was selling ounces, half-ounces and quarter- ounces of cocaine to his (DeMarco Jr.'s) various customers, and complained that DeMarco Jr. was putting all the profits "up his nose." In addition, Scott testified that after Callahan was arrested, DeMarco Jr. complained that he (DeMarco Jr.) was supposed to receive the briefcase in which Callahan had stored a quantity of cocaine to conceal it from the DEA. The evidence was adequate to find that DeMarco Jr. entered into an agreement to distribute cocaine and possessed cocaine with intent to distribute it. E. Philip Bargalla Bargalla was convicted of conspiracy to distribute, but acquitted of the substantive count of possession of cocaine with intent to distribute (the "PWI" count) and instead convicted of the lesser included offense of simple possession. Bargalla argues that there was inadequate evidence that he entered into a conspiracy to distribute and that, especially in light of his acquittal of the PWI offense, the conspiracy conviction must have resulted from prejudicial "spillover." Bargalla argues that a conspiracy cannot fairly be inferred from the facts that Bargalla took possession of Callahan's briefcase after Callahan's arrest, -30- -30- and was in possession of Callahan's car at the time it was seized by the DEA. The short answer is that additional evidence showed that Bargalla was a regular purchaser of cocaine and marijuana from Callahan and a distributer in his own right. For example, Jeffrey Scott testified that he made about five deliveries of marijuana to Bargalla from Callahan in 1987, and Callahan confirmed that he sold cocaine and marijuana to Bargalla on a regular basis beginning in late 1985 or early 1986. Moreover, there was evidence that Bargalla resold some of the narcotics he acquired from Callahan. Scott testified that he saw distribution paraphernalia -- a small scale and chemicals such as Inositol that are used to mix with cocaine to increase its volume -- in Bargalla's bedroom. Scott also testified that Bargalla complained that people were not paying him on time for the cocaine and marijuana that Bargalla provided them. This evidence was more than sufficient to support Bargalla's conviction for conspiring to distribute cocaine and marijuana. The testimony concerning the briefcase and Callahan's car merely served to corroborate Bargalla's close relationship with Callahan and his organization. The jury's favorable treatment of him on the PWI count may or may not be a windfall but it cannot be used to impeach the conspiracy conviction. See United States v. Senibaldi, 959 F.2d 1131, ___ _____________ _________ -31- -31- 1135 (1st Cir. 1992) ("inconsistency in a criminal verdict is not grounds for overturning it"). F. James Litterio Litterio does not question the sufficiency of the evidence to support his conviction for conspiracy. Instead, he challenges the evidence with respect to count five, under which he and Innamorati were convicted of possession with intent to distribute cocaine on or about September 2, 1987. We find the evidence sufficient. The primary evidence supporting the possession charge was the testimony of Tulowiecki, who described a four-ounce purchase of cocaine by Litterio from Innamorati shortly before September 2, 1987. Tulowiecki testified in detail that he and Innamorati packaged four ounces of cocaine, delivered the package to Litterio, and received the $5300 payment several days later. Tulowiecki also testified that in the course of arranging this transaction Litterio said that he wanted the four ounces of cocaine for his brother Mark. In addition, in January 1989 Tulowiecki secretly recorded a conversation with Litterio in which Litterio referred to the four-ounce transaction. Litterio argues at length that Tulowiecki's testimony was inherently unreliable and uncorroborated. The credibility of Tulowiecki's testimony was a matter for the jury to resolve. As it happens, there was evidence that Mark -32- -32- Litterio visited James Litterio immediately after the latter acquired the drugs, and further evidence that Mark Litterio was involved in the sale of four ounces of cocaine to undercover officers just after James Litterio's four-ounce purchase from Innamorati. The jury could easily conclude that James Litterio provided the four-ounce package to Mark after acquiring it from Innamorati. G. Joseph Gilberti Gilberti argues that evidence of "isolated sales" of cocaine from Callahan or Scott to Gilberti is not sufficient to convict Gilberti of participation in a conspiracy to distribute. The evidence, however, showed more than mere "isolated sales;" it showed that Gilberti was another cog in the Callahan/Innamorati machine. Scott testified that he delivered cocaine to Gilberti for Callahan in 1986, generally in one to two-ounce quantities. He testified that he made approximately 25 to 50 deliveries of this nature to Gilberti over a six-month period, including one four-ounce delivery. Callahan confirmed that Gilberti was one of the individuals to whom he delivered cocaine. Gilberti developed a code with Scott and Callahan so that he could order drugs over the telephone without detection; he would refer to "green buckets of paint" when ordering marijuana, and "white buckets of paint" when requesting cocaine. -33- -33- There was also evidence that the distribution of the cocaine did not end when it reached Gilberti. Scott testified that he gave Gilberti drug distribution paraphernalia-- including a scale, ziploc bags and other packaging, and sudocaine, a product used to mix with cocaine- -and showed Gilberti how to use these items. Callahan testified that Gilberti told him that he, Gilberti, had been distributing cocaine to an individual named Ricky Green. The evidence was adequate to support Gilberti's conviction for conspiracy and possession of cocaine with intent to distribute. The same evidence supported the forfeiture of Gilberti's property under 21 U.S.C. 853, since his only challenge to that forfeiture is that the evidence underlying the conspiracy conviction was deficient. IV. GRAND JURY TESTIMONY OF WILLIAM THOMPSON On June 22, 1988, Thompson testified at length before the grand jury about the drug distribution conspiracy in this case. Thompson's testimony consisted almost entirely of the government's recitation of a prior statement made by Thompson to a DEA agent, interspersed at intervals with Thompson's confirmation of the truth of the prior statement, sometimes with qualifications. Some of this testimony incriminated Thompson himself, but a great deal of the testimony incriminated certain of his co-defendants, particularly -34- -34- Innamorati. Thompson was subsequently indicted by the grand jury along with the other defendants in this case. At trial, Thompson elected not to testify. The court, over defendants' objections, permitted the government to read into evidence the entire transcript of Thompson's grand jury testimony. Innamorati, Grady, Boisoneau and, surprisingly, Thompson himself claim that this testimony was inadmissible hearsay and that its introduction was reversible error. The defendants also argue that the introduction of this evidence violated their Sixth Amendment right to confront the witnesses against them, but this amounts to the same argument dressed in different garb.4 A. Admissibility The basis for the district court's admission of Thompson's grand jury testimony is not entirely clear from the record. At one point, the court stated: I'm going to allow . . . [the grand jury testimony] in evidence and instruct the jury the conversations pertaining to Thompson are admitted at this point only against Thompson. Unless and until there is other evidence that connects the other named ____________________ 4The admission of an out-of-court statement falling within a "firmly rooted" exception to the hearsay rule does not violate the Confrontation Clause. See Bourjaily v. ___ _____________ United States, 483 U.S. 171, 182-83 (1987); Ohio v. Roberts, _____________ ____ _______ 448 U.S. 56, 66 (1980). Most courts have concluded that the declaration against interest exception embodied in Fed. R. Evid. 804(b)(3) is a "firmly rooted" exception to the hearsay rule. See, e.g., United States v. York, 933 F.2d 1343, 1363- ___ ____ _____________________ 64 & n.5 (7th Cir.), cert. denied, 112 S. Ct. 321 (1991). _____________ Thus, the constitutional issue merges into the evidentiary question. -35- -35- defendants in this conspiracy, it's excluded against them. Shortly thereafter, in response to a renewed objection by defense counsel, the court ruled that "the grand jury testimony of William Thompson is allowed. It's allowed against Thompson. It's a declaration against interest, and I'll explain that to the jury." Id. at 62. No explanation __ or limiting instruction was given to the jury. The only argument urged by the United States in this appeal to overcome the hearsay objection is that the grand jury testimony was a declaration against interest. Fed. R. Evid. 804(b)(3) excepts from the hearsay rule, when the declarant is unavailable as a witness, [a] statement which . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. Thompson's invocation of the Fifth Amendment at trial rendered him "unavailable" for purposes of Rule 804(b)(3). See California v. Green, 399 U.S. 149, 168 n.17 (1970). ___ __________ _____ Under the exception, a declaration against interest is admissible against anyone to whom the statement pertains. See United States v. Myers, 892 F.2d 642, 644 (7th Cir. ___ ______________ _____ 1990). Whether Thompson's grand jury testimony represents a statement against penal interest poses the question how -36- -36- broadly to define the concept of a "statement." One could describe the entire grand jury testimony as a single statement or, at the other extreme, could subdivide a single sentence ("John and I robbed the bank") into two different statements to be tested separately. Both the rationale of the exception--the trustworthiness of the unit to be admitted--and our own precedents yield no mechanical rule as to where, in between these extremes, the line is to be drawn. A further concern is that, even if a broad view is taken as to the scope of the "statement," a co-defendant who confesses to the authorities and inculpates another may be seeking to curry favor and cast the main blame upon another. Thus the "statement" as a whole may be very much in the interests of the confessing party who is minimizing his or her role. Some have urged a blanket exclusion of such confessions as inherently untrustworthy; early drafts of Rule 804(b)(3) excluded "a statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused." See ___ generally 4 Weinstein & Berger, Weinstein's Evidence, _________ _____________________ 804(b)(3) [03] at 804-152 & n.42 (1992). We need not pursue these issues in depth. Thompson's lengthy grand jury testimony contains only a few statements that are directly against Thompson's penal interest--for example, his descriptions of procuring the cellular phones -37- -37- and checking license plate numbers--and even these could be innocent acts, were context ignored. If these inculpatory statements of Thompson were isolated from the rest, it would be hard to say that the balance of the grand jury testimony, especially the numerous accusations against Innamorati, were against Callahan's interest. Thus if the directly inculpatory statements are severed, little of the grand jury testimony would be against Thompson's interest and admissible against third parties. If the inculpatory statements are not severed, the same result prevails. Taken as a whole the testimony greatly minimizes Thompson's own role in any wrongdoing. He admitted a few acts of logistical assistance, doubtless hoping to maintain (as he does here) that they were innocently motivated. But the thrust of the testimony is that others were guilty of wrongdoing from which Thompson himself had been excluded but happened to have some knowledge. Although later the extent of this knowledge could be turned into an inference harmful to his interests, it is difficult to view the testimony as a whole as consciously contrary to Thompson's self-interest at the time it was made. "[F]or the declaration to be trustworthy the declarant must have known it was against his interest at the time he made the statement". Filesi v. United States, 352 F.2d 339, 343 (4th ______ _____________ Cir. 1965). -38- -38- In sum, the bulk of the testimony did not qualify as a declaration against penal interest. As to Thompson, anything he said constituted an admission so there was no error in receiving the grand jury testimony as to him. Fed. R. Evid. 801(d)(2)(A). But as to the other defendants, most of the testimony was both hearsay and outside the scope of Rule 804(b)(3)'s exception. We need not consider whether a limiting instruction would have been a sufficient safeguard to allow the testimony against Thompson but not the others, compare Bruton v. United States, 319 U.S. 123 (1968), since _______ ______ ______________ no such instruction was given. B. Prejudice Since error was committed in allowing the grand jury testimony except as to Thompson, the only remaining question is whether it was prejudicial as to the other defendants who complain of its admission: Innamorati, Grady, and Boisoneau. On direct appeal, in the case of a constitutional error (as this one may be viewed in light of the Confrontation Clause), the test for harmless error is a demanding one. The appellate court must be persuaded beyond a reasonable doubt that the jury's verdict was not attributable to the challenged evidence. See Harrington v. California, 395 U.S. ___ __________ __________ 250, 254 (1967); Milton v. Wainwright, 407 U.S. 371, 377-78 ______ __________ (1972); United States v. Figueroa, 976 F.2d 1446, 1455 (1st _____________ ________ Cir. 1992), cert. denied, 113 S. Ct. 1346 (1993). ____________ -39- -39- This test is, and ought to be, stringently applied, resolving all reasonable doubts against the government, since it comes close to a trespass upon the jury's function. But the case law is clear that, if the legitimate evidence unquestionably assured the jury's verdict of conviction, the error in admitting other evidence is not normally grounds for reversal. Harrington, 395 U.S. at 256; Figueroa, 976 F.2d at __________ ________ 1455.5 Nor is this harmless error test confined to inadmissible evidence so slight or duplicative that one can assume that the jury scarcely noticed it. The wrongfully admitted evidence must be "quantitatively assessed in the context of other evidence presented . . . ." Sullivan, 61 ________ U.S.L.W. at 4519 (quoting Arizona v. Fulminante, 111 S. Ct. _______ __________ 1246, 1264 (1991)). Even where the wrongfully admitted evidence is singular and weighty, it can still be "harmless" where the legitimate evidence is overwhelming. E.g., Clark ____ _____ v. Moran, 942 F.2d 24, 27 (1st Cir. 1991). _____ Against this background, we conclude that the wrongful admission of the grand jury testimony did not alter the inevitable outcome of the case against Innamorati. We reach this conclusion only after a careful scrutiny of the record, ____________________ 5Errors that the Supreme Court deems to warrant automatic reversal are rare. See, e.g., Sullivan v. ___ ____ ________ Louisiana, 61 U.S.L.W. 4518 (June 1, 1993) (improper _________ reasonable doubt instruction); Chapman v. California, 386 _______ __________ U.S. 18, 23 n.8 (1966) (denial of right to counsel or partiality of trial judge). -40- -40- for the grand jury testimony inculpates Innamorati in a number of respects that are neither trivial nor literally duplicative of other evidence. Among other things Thompson testified that: Mr. Innamorati sold marijuana while in high school . . . . Around 1970 . . . [he] developed a large distribution network which comprised of [sic] many residents of Clinton and Lancaster, Massachusetts. [I]n 1985 Mr. Innamorati was arrested by the Massachusetts State Police [while in possession of cocaine and he later boasted that he] had paid his attorney . . . several thousand dollars to fix the charges against Mr. Innamorati. [I]n the fall of 1987, [I] became aware that both Innamorati and Tulowiecki purchased automatic pistols and possessed these pistols when making drug transactions. On several occasions, [I] saw Innamorati and Tulowiecki before and after drug deals and they were always carrying the pistols. Tulowiecki also told [me] that Innamorati sent Paula [sic] Bufton [Innamorati's companion] to the corrections facility to visit Tulowiecki, and during the meeting, Bufton told Tulowiecki that Innamorati put aside one hundred thousand dollars for any legal aid that Tulowiecki would incur . . . . [Bufton told] Tulowiecki to be patient and don't fold. That Tulowiecki would be taken care of if he did the right thing. Nevertheless, the case against Innamorati was overwhelming and it is no accident that his "insufficiency of the evidence" argument on this appeal is confined to conclusory assertions. No less than seven persons testified from personal knowledge that Innamorati was engaged in cocaine and marijuana dealing, including among others his partners (Callahan and Fitzgerald), his companion (Pamela -41- -41- Bufton), and his lieutenant and record-keeper (Tulowiecki). Drugs and money were confided by Innamorati to his friend James Casasanto for safe-keeping when the authorities closed in on the ring; and drugs, weapons, paraphernalia, and records were found in the Edgewater apartment that Tulowiecki maintained at Innamorati's behest. In fact, the case against Innamorati--who stood at the center of the ring's spider web--was a composite of individual cases against other ring members, reinforced by additional evidence against Innamorati. All of the other ring members on this appeal played smaller parts but were convicted on the conspiracy charge by the jury. Most of these persons were not directly implicated by Thompson's grand jury testimony or the testimony was at most duplicative as to them. It defies belief that the jury, faced with the aggregate of evidence against Innamorati, would have acquitted him of conspiracy if the grand jury testimony had been deleted from the record. The remaining convictions against Innamorati stand on the same footing. To establish a continuing criminal enterprise under 21 U.S.C. 848, the government needed to show only that Innamorati committed a continuing series of violations of the federal narcotics laws and that he managed or organized five or more individuals. See United States v. ___ _____________ David, 940 F.2d at 732. Without considering Thompson's _____ -42- -42- testimony, the evidence showed continuing violations and that more than five persons acted at Innamorati's direction. The individual possession counts against Innamorati were not significantly bolstered by the Thompson testimony and the weapons count--which Thompson corroborates--was supported by ample and untainted evidence from other witnesses. We conclude that the grand jury testimony was, as to Innamorati, harmless beyond a reasonable doubt. Turning to Boisoneau, Thompson's grand jury testimony contains only two references to him. Near the conclusion of his testimony, Thompson identified Boisoneau as one of several "customers of Innamorati," and stated that he was present at times when Innamorati supplied cocaine to these customers. A short time later, Thompson testified that Boisoneau and the other "customers" that he had identified "were just weekend users," as opposed to distributors. Id. __ at 114. These two statements were harmless beyond a reasonable doubt in light of the abundant independent evidence of Boisoneau's cocaine use and of his relationship with Innamorati. Tulowiecki testified that Boisoneau was one of Innamorati's customers; that Tulowiecki had personally delivered cocaine to Boisoneau; that Boisoneau was assigned beeper number 004 in Innamorati's communications network; and that Boisoneau visited Tulowiecki in prison and relayed a -43- -43- message from Innamorati regarding the importance of "keeping [Tulowiecki's] mouth shut." Records kept by Tulowiecki of Innamorati's drug sales showed that Boisoneau purchased a total of 19 grams of cocaine between September 1987 and January 1988. Other witnesses, such as Pamela Bufton and James Casasanto, also provided incriminating evidence. Bufton, for example, testified that Boisoneau had aided in a delivery of cocaine to Innamorati. It is fair to say that, as to Boisoneau, Thompson's testimony ("just [a] weekend user[]") was almost favorable. That Boisoneau was a customer no one could fairly doubt. The additional detail that made a conspiracy charge plausible came almost entirely from others whom the jury chose to believe. Finally, as to Grady, we have scoured the thirty pages of Thompson's grand jury testimony and are unable to find a single reference to Grady. Grady in his brief does not suggest any way in which he was directly prejudiced by the admission of this evidence. We have no trouble, therefore, concluding that the admission of the grand jury testimony was harmless as to Grady. V. VARIANCE Boisoneau argues that a "variance" between the facts alleged in the indictment and the facts adduced at trial prejudiced his ability to defend the charges against him. -44- -44- Although he uses the language of variance, Boisoneau's entire argument is devoted to the contention that the government introduced evidence at trial in addition to the evidence __ ________ __ listed as overt acts in the indictment and presented to the grand jury. The indictment sets forth 44 paragraphs of overt acts in support of the alleged conspiracy. Paragraph 36 alleges that, between May 1, 1987, and early 1988, Tulowiecki distributed multi-ounce quantities of cocaine per month to several buyers, including Boisoneau. Paragraph 37 alleges that Tulowiecki's records show that Boisoneau purchased a total of 12 grams of cocaine between September 27 and October 23, 1987. Boisoneau does not contend that the government failed to prove these allegations at trial. Instead, he argues that he was charged only with these acts, and that the ____ government "varied" from the indictment by offering additional evidence, such as testimony that Boisoneau placed cocaine in the trunk of a car that was to be driven to Maine where Innamorati was staying, and testimony that Boisoneau introduced Tulowiecki to two individuals who wanted to purchase cocaine. Boisoneau misapprehends the law. The government need not recite all of its evidence in the indictment, nor is it limited at trial to the overt acts listed in the indictment. E.g., United States v. Ellender, 947 F.2d 748, 755 (5th Cir. ____ _____________ ________ -45- -45- 1991). The indictment charged all defendants, including Boisoneau, with engaging in a conspiracy to distribute cocaine and marijuana between 1984 and 1988. The evidence complained of by Boisoneau falls squarely within the scope of that alleged conspiracy, both temporally and substantively. There is no variance.6 VI. RESTRICTIONS ON CROSS-EXAMINATION A. Paul Callahan Callahan was originally joined in the indictment as a co-conspirator, but pleaded guilty prior to trial and was a principal government witness at trial. Defendants sought to impeach Callahan's credibility during cross-examination with evidence that he had engaged in a wide of variety of criminal acts throughout his life. The jury learned from the evidence that Callahan had worked as a safecracker, that he was convicted for a dozen specific acts of safecracking, that he was a bookmaker, a bank robber, a burglar, a drug dealer, and a perjurer, and that he spent much of his adult life--more than sixteen years--in prison. But the court excluded evidence relating to Callahan's participation in disposing of ____________________ 6In discussing the supposed variance, Boisoneau also alleges that the government failed to produce exculpatory evidence and questions the district court's denial of a motion for a bill of particulars. No effort is made to develop these issues, however, and we do not address them. Zannino, 895 F.2d at 17. For the same reason, we do not _______ discuss Innamorati's brief and conclusory claim of improper variance. -46- -46- the bodies of two homicide victims in the 1960's, and to another incident in 1970 in which Callahan provided a silencer to another individual who later used the silencer in a shooting. Innamorati, Thompson, Grady, DeMarco Sr., and DeMarco Jr. argue that this ruling improperly limited their right of cross-examination and their Sixth Amendment right to confront witnesses against them. The trial judge apparently concluded that the references to the homicides and silencer, events 20 to 30 years in the past, were of limited importance in impeaching Callahan and created a risk of prejudice that outweighed any benefit from the evidence. The use of such ancient evidence merely to show bad character for veracity is doubtful, cf. Fed R. Evid. __ 609(b)(10-year-old felonies presumptively excluded), and in this case the excluded evidence was weak and largely cumulative so far as it cast an unflattering light on Callahan's character for veracity. Judgments of this kind are very much within the trial court's discretion. See ___ United States v. Garcia-Rosa, 876 F.2d 209, 237 (1st Cir. _____________ ___________ 1989), cert. denied, 493 U.S. 1030, vacated on other grounds, ____________ _______ __ _____ _______ 498 U.S. 954 (1990). We see no abuse in excluding the evidence for this use. There is a somewhat more substantial use that might have been made of the evidence, namely, to suggest that Callahan could still be prosecuted for involvement in homicides, -47- -47- giving the government some hold over him. But there was no indication when the questions were sought to be asked in this case that the applicable statute of limitations still permitted prosecution or, even if it did, that federal authorities controlled the decision as to future prosecution. It is not even clear that the prior bad acts were offered to show that Callahan was subject to government pressure or that this objective was squarely presented to the district judge. In sum, we do not think that cross examination of Callahan was unreasonably restricted. Similarly, since a reasonable opportunity to test Callahan's veracity and motives was offered, no Confrontation Clause issue is presented. "Once the defendant has been afforded a reasonable opportunity" for such an inquiry, "the trial judge retains broad discretion in determining the scope or extent of cross examination." Garcia-Rosa, 876 F.2d at 237. ___________ B. Sean McDonough Thompson challenges the district court's restrictions upon his cross-examination of DEA agent Sean McDonough. At trial, McDonough testified that the government had lost the only copy of a "corrected statement" that Thompson had provided to the DEA and that, according to Thompson, contained material exculpatory evidence. This statement may have been in McDonough's custody at the time it was misplaced. On cross-examination of McDonough, Thompson's -48- -48- counsel sought to show that, in a prior unrelated case, 86 seconds mysteriously had been erased from an audio tape in McDonough's custody. The trial court sustained the government's objection to this line of inquiry. The intent of Thompson's counsel in inquiring about the erased tape was to suggest to the jury that in both instances--the missing 86 seconds and the misplaced DEA statement--Agent McDonough had deliberately concealed or destroyed material evidence. Counsel did not proffer any proof that the missing portion of the tape had been linked to misconduct by McDonough, nor was there any showing that the corrected statement in this case had been deliberately misplaced. Absent a foundation for this inquiry, the district court was justified under Fed. R. Evid. 403 in forbidding the question. VII. QUASHING OF SUBPOENAS OF SPRINGFIELD POLICE OFFICERS During direct examination, government witness Scott gave the following account of an incident that allegedly occurred during his cooperation with the DEA. On November 27, 1987, prior to Callahan's agreement to cooperate with the government, two DEA agents wired Scott with a hidden recording device and brought him to a bar to meet and record a conversation with Callahan. After the meeting, the agents agreed to allow Scott to stop by his girlfriend's house before returning to DEA headquarters. Scott went into the -49- -49- house--leaving the agents waiting in the car outside--and was arrested by officers of the Springfield police department who coincidentally were raiding the house as part of an unrelated investigation. According to Scott's testimony, one officer searched Scott and found nothing. Then a second officer searched Scott and purported to find vials of cocaine. Scott was taken to police headquarters and charged with possession of cocaine with intent to distribute. Scott testified that he did not have any cocaine in his possession on this occasion, and would never have carried cocaine in such a situation since he knew it was standard procedure for the DEA agents to search him thoroughly each time he returned to the vehicle. Scott testified that after being released by the Springfield police officers he contacted the DEA agents to complain about the arrest--he thought at first that the arrest had been a ploy by the DEA, in conjunction with the Springfield police, to get him "under their thumb"--and that subsequently the charges were dismissed and he was not prosecuted.7 Following this testimony, several of the defendants sought to subpoena the Springfield police officers involved in this incident in an attempt to prove that Scott did in ____________________ 7The DEA agents testified that they too were approached by Springfield police officers while waiting in their car in front of the house. Not wanting to expose Scott's role in the investigation, they quickly departed. -50- -50- fact possess cocaine on that evening. The district court quashed the subpoenas, finding that the proposed testimony was inadmissible under Fed. R. Evid. 608(b), which provides that "[s]pecific instances of the conduct of a witness, for the purposes of attacking or supporting the witness' credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence." Defendants argue that the officers' proposed testimony was not excluded by Rule 608(b), because defendants did not seek merely to impeach Scott's credibility through extrinsic evidence of a prior bad act but also sought to contradict a specific assertion made by him during his direct testimony, thereby showing that he had lied before the jury in the very case. Nevertheless, the proposed contradiction involved a matter collateral to the main issues in this trial, since the Springfield incident did not in any way involve any of the defendants or the charges against them. A court may, indeed normally does, preclude a party from proving with extrinsic evidence that a witness lied in court on a collateral matter. See United States v. Tejada, 886 F.2d 483, 489 (1st Cir. ___ _____________ ______ 1989); Walker v. Firestone Tire & Rubber Co., 412 F.2d 60, 63 ______ ___________________________ (2d Cir. 1969). Here, the district court was justified in preventing a major detour into this essentially irrelevant episode. -51- -51- Defendants say that the Springfield officers' testimony was relevant because it showed that Scott continued to use ___ cocaine even after his cooperation with the DEA, which rebutted his testimony that he contacted the DEA because he "knew what we were doing was totally and completely wrong" and wanted "to make things right." But Scott admitted on cross-examination that he used cocaine long after he began to cooperate with the DEA, in fact up until a couple of months prior to the trial. Thus, the Springfield episode was at best cumulative evidence, and given the diversion involved to procure it, properly excluded as duplicative on this issue. Any claim by Scott as to the purity of his motive was undoubtedly discounted by the jury since Scott received $250,000 from the government, as well as other benefits. VIII. BELATED PRODUCTION OF DEA NOTES, AND TESTIMONY OF DEA AGENT O'BRIEN Edward O'Brien was a DEA agent who was involved in the early investigation of this case, but subsequently left the DEA under some sort of cloud; the circumstances of his departure from the agency are unclear. Early in the proceedings, the court granted the government's motion to exclude any reference to O'Brien at trial, stating: "I don't want him coming in and the government being prejudiced against [sic] because they had an agent who turned out bad. So we will kick that out." -52- -52- On the fifth day of trial, after the court made its initial decision to exclude O'Brien, the government produced to defendants notes made by DEA Agents McDonough and O'Brien during their initial debriefing of Scott. Contained within these documents was a notation that arguably reads "driver for Fitzgerald = Wall." Grady argued that the notes tended to exculpate him, since he was accused of being the truck driver for the conspiracy. His theory was that the notes indicated that the truck driver was actually an individual named Wally Barrett, whose name had surfaced on other occasions during the trial. Grady questioned Agent McDonough about the notation but McDonough testified that he was not present during the entire debriefing, that he believed this particular notation was made by Agent O'Brien, and that he (McDonough) knew nothing about it. Grady then asked the court either for dismissal or a mistrial based on the belated disclosure of the exculpatory evidence or, alternatively, for permission to call Agent O'Brien in light of these new developments. The court denied both of these requests. Grady argues, first, that the belated disclosure of the DEA notes violated Brady v. _____ Maryland, 373 U.S. 83 (1963), and deprived him of fair trial; ________ and second, that the court's exclusion of Agent O'Brien further compounded this violation. -53- -53- We agree that the "Wall" notation constituted exculpatory evidence within the meaning of Brady. It _____ provided Grady with a basis for arguing, or at least developing evidence to show, that "Wally" and not Grady was the truck driver. However, in cases of belated disclosure, as opposed to outright non-disclosure, of exculpatory evidence, "the critical inquiry is . . . whether the tardiness prevented defense counsel from employing the material to good effect." United States v. Devin, 918 F.2d _____________ ______ 280, 290 (1st Cir. 1990). Here, the notation was produced early in the trial, well before the start of defendants' case (indeed, prior to cross-examination of the government's first witness). We do not believe that Grady was prevented from making good use of the information or otherwise prejudiced by the delay.8 Although Grady argues that he was prejudiced by being deprived of the opportunity to investigate the "Wall" reference prior to trial, he never asked the trial court for a continuance to allow him to investigate the reference. We have held it "incumbent upon a party faced with such a situation to ask explicitly that the court grant the time ____________________ 8There is no indication that the notation was withheld in bad faith or deliberately suppressed. The disputed notation consists of one line in a voluminous collection of notes; the notation itself is difficult to decipher and is subject to different readings. Its exculpatory nature--even assuming defendants' reading is the correct one--is not immediately apparent. -54- -54- needed to regroup, or waive the point . . . ." United States _____________ v. Diaz-Villafane, 874 F.2d 43, 47 (1st Cir.), cert. denied, ______________ ____________ 493 U.S. 862 (1989). Nor has Grady described any specific avenue of investigation that would have been pursued had the notation been disclosed earlier. Accordingly, we conclude that the belated disclosure of the "Wall" notation did not prejudice Grady and does not entitle him to a new trial. Grady contends that at the very least he should have been permitted to call Agent O'Brien to the stand to question him about the notation. The government's unsupported response that O'Brien "likely had little to add concerning the notes of the Jeffrey Scott debriefing" is not at all comforting. What O'Brien might have added is that Scott did say that the driver referred to was Wally Barrett, information that would be helpful to Grady if it were __ admissible for its truth. But Scott's statements to O'Brien during the debriefing would have been inadmissible hearsay if offered for their truth (as opposed to impeachment). Thus, the exclusion of O'Brien did not prejudice Grady in this respect. The only apparent use that Grady could have made at trial of the "Wall" notation would have been to impeach Jeffrey Scott's testimony. Scott testified that he did not know the name of Innamorati's driver; Grady could have asked him on cross-examination whether he recalled telling the DEA -55- -55- that the driver's name was Wally. Grady sought to call O'Brien to the stand to question him about the notation, but _______ he never sought to recall Scott for further cross - examination once the notes were produced. If Scott had been asked about the "Wall" statement and denied making it, then Grady might have been entitled to call O'Brien in an effort to prove that Scott in fact made the statement. Absent any effort by Grady to cross-examine Scott on the point, we cannot see how the court's refusal to involve O'Brien prejudiced Grady.9 IX. PAYMENTS TO WITNESS Scott, a key witness for the prosecution, received $250,000 from the government prior to trial for his cooperation as well as immunity from prosecution and enrollment in the federal witness protection program. The $250,000 payment was made pursuant to a DEA program that awards twenty percent of the value of seized assets to parties who are instrumental in successful investigations. ____________________ 9Grady also complains of the district court's denial of his motion for a mistrial based on a violation of the court's sequestration order. The violation occurred when the government permitted Fitzgerald and Callahan to converse together in the prosecutor's office after Callahan's testimony but prior to Fitzgerald's. The district court held a voir dire, rebuked the government, but refused to declare a mistrial. Briefly addressing this issue, Grady provides no persuasive explanation for his claim of prejudice and we do not think that the trial court abused its discretion in denying the mistrial motion. See United States v. Rossetti, ___ _________________________ 768 F.2d 12, 16 (1st Cir. 1985). -56- -56- Gilberti argues that these benefits conferred upon Scott were so likely to induce perjury that they infringed upon defendants' right to a fair trial, and he points to our dictum in United States v. Dailey, 759 F.2d 192 (1st Cir. ______________ ______ 1985), that "we can think of no instance in which the government would be justified in making a promised benefit contingent upon the return of an indictment or a guilty verdict." Id. at 210 (footnote omitted). __ Subsequently in United States v. Cresta, 825 F.2d 538 _____________ ______ (1st Cir. 1987), cert. denied, 486 U.S. 1042 (1988), this ____________ court upheld an agreement much like that in this case. In Cresta a government witness was promised $50,000 from the ______ sale of a vessel that was to be seized and forfeited to the government as a result of the witness's cooperation. Cresta ______ relied upon the facts that the terms of the agreement were disclosed to defense counsel and explored on cross- examination; there was substantial corroboration of the witness's testimony; and the court admonished the jury to weigh carefully the credibility of accomplice testimony. See ___ id. at 546.10 __ Those same facts are present in this case. The terms of the agreement were not concealed; to the contrary, ____________________ 10See also United States v. Wilson, 904 F.2d 656 (11th ________ _____________ ______ Cir. 1990) (testimony by government witnesses who could potentially recover up to $11 million held not to violate due process), cert. denied, 112 S. Ct. 250 (1991). ____________ -57- -57- defendants' counsel questioned Scott closely about his arrangements with the government, and argued at length in closing that Scott should be disbelieved as a result of them. There was evidence to corroborate virtually every aspect of Scott's testimony. And the court instructed the jury to consider carefully any inducements or advantages that any witnesses had received. Finally, the $250,000 payment to Scott was completed several days prior to trial, and the payment was thus not directly dependent upon the result of Scott's testimony in court. Clearly such immense payments are troubling. The payments may be for "information," rather than for later testimony or convictions, but the steps are linked and the inducement to testify in accordance with prior reports is obvious. Yet defendants are regularly convicted based on testimony secured by the prosecutor's decision to reduce or dismiss charges against testifying co-defendants. In fact, Congress has enacted statutes that directly reward those who disclose misconduct and who doubtless testify for the -58- -58- government in the ensuing trials.11 In all events, Cresta ______ is the governing law in this circuit and controls this case. X. COMMENTS BY THE PROSECUTION Boisoneau alleges that he was unfairly prejudiced by improper comments made by the prosecutor during closing argument. First, Boisoneau challenges the following passage from the prosecutor's rebuttal argument at the close of the case, in which the prosecutor sought to justify the government's $250,000 payment to Scott in exchange for his cooperation: What did the government know before Jeffrey Scott walked into the [DEA] in contrast to what the government knew as a result of Jeffrey Scott's cooperation? And even on pure dollars and cents, consider the amount of forfeitures, the seizures that it led to. But go beyond that, because if you do a cost benefit analysis you must also consider the cost that was saved to society by dismantling an operation like the one you've heard about here. . . . Boisoneau made no objection to these remarks during trial, and our review is therefore limited to plain error. Fed. R. Crim. P. 52(b). ____________________ 11"[R]ewards for assistance are essential to the business of detecting and punishing crime." United States v. _____________ Bringham, 977 F.2d 317, 318 (7th Cir. 1992). See, e.g., 31 ________ ___ ____ U.S.C. 3730(d) (providing for an award of up to 10 percent of the proceeds of suit to any individual whose provision of information leads to government's recovery of funds under the False Claims Act, 31 U.S.C. 3729); 26 U.S.C. 7623 (providing for Secretary of Treasury to make awards "for detecting and bringing to punishment persons guilty of violating the internal revenue laws"). -59- -59- Boisoneau now argues that the prosecutor's statement was an improper allusion to facts not in the evidence, namely, to some actual cost-benefit analysis commissioned by the government showing the advantages and disadvantages of the payment to Scott. These remarks do not suggest to us that some actual cost-benefit analysis was undertaken: they are nothing more than an argument, using the latest fashionable jargon, that the payment was reasonable in light of the results obtained. The prosecutor's own language--"if you do ___ a cost benefit analysis"--shows that he was merely suggesting a way for the jury to look at the payment. Boisoneau also objects to the prosecutor's statement in closing that the trial judge alone would determine the sentences for each of the cooperating witnesses, and that the jury therefore should not think that the witnesses were getting "a walk." Boisoneau points out that in fact the government had dismissed, or elected not to assert, numerous criminal charges against many of the cooperating witnesses and also had promised to make motions for downward departures with respect to certain witnesses. Therefore, Boisoneau argues, the government in fact had far more significant influence on the witnesses' ultimate sentences than the prosecutor's disclaimers would suggest. We agree that the prosecutor's statement told only half the story, but it is usually the function of opposing counsel -60- -60- to remind the jury of the other half. Indeed, witnesses are normally cross-examined as to just such inducements. Perhaps in some instances a prosecutor's incomplete version of events might involve so much distortion that a cautionary instruction by the trial judge would be required. In this instance, no objection was made at the trial nor any instruction sought, and there is no "plain error" here in the court's failure to give such an instruction sua sponte. We __________ have similarly examined Boisoneau's other claims of prejudicial error arising out of the prosecutor's closing arguments and find them unpersuasive. Nor do we see any merit in Thompson's suggestion that the prosecutor's closing argument contained improper "vouching" for the government's witnesses. The line between the legitimate argument that a witness's testimony is credible and improper "vouching" is often a hazy one, to be policed by the trial court in the first instance. See United ___ ______ States v. Martin, 815 F.2d 818, 822-23 (1st Cir.), cert ______ ______ ____ denied, 484 U.S. 825 (1987). Here, at worst the challenged ______ remarks -- for example, the prosecutor's statement that "[t]he testimony of the witnesses in this case is well corroborated . . . [a]nd as a result, you know that the witness's testimony is true" -- fell in the grey area. Thompson did not object to the remarks at trial when a -61- -61- curative instruction might have been given, and we think that is the end of the matter. XI. FAILURE TO PRESERVE EVIDENCE Thompson argues that his due process rights were violated by the government's failure to preserve exculpatory evidence, specifically a DEA-6 form prepared by Agent McDonough summarizing an interview with Thompson. It appears that McDonough interviewed Thompson on March 10, 1988, and then memorialized the interview on the DEA-6 form. On June 22, 1988, just prior to Thompson's appearance before the grand jury, McDonough again met with Thompson, and Thompson made certain handwritten corrections on the form and then signed it. In the grand jury, the government attorney read each statement on the DEA-6 form to Thompson, and then asked Thompson to confirm the truth of the statement. Thompson did so, making some modifications or corrections. The form with Thompson's handwritten corrections was lost after the grand jury appearance. Thompson filed a motion to dismiss the indictment on the ground that the DEA-6 form as corrected by him prior to the grand jury appearance was material exculpatory evidence, and that the government's failure to preserve that evidence deprived him of a fair trial. This motion was denied by the magistrate judge to whom it was referred. The magistrate judge's report advised the parties that pursuant to the local -62- -62- rules the failure to file written objections to the report within ten days "shall preclude further appellate review by the Court of Appeals." Thompson failed to file a written objection. The issue, therefore, was waived. See Thomas v. ___ ______ Arn, 474 U.S. 140, 155 (1985); United States v. Valencia- ___ _____________ _________ Copete, 792 F.2d 4, 6 (1st Cir. 1986). ______ Although we will address waived issues where necessary to prevent a miscarriage of justice, we certainly perceive none here. The corrected DEA-6 form was essentially preserved by the grand jury testimony itself, during which the government attorney went through the form line-by-line. The transcript of this grand jury testimony was read to the jury at trial. XII. JURY INSTRUCTIONS Several defendants--Thompson, Letters, Litterio and Boisoneau--challenge various aspects of the district court's charge to the jury. First, Thompson argues that the court erred by denying his request for an instruction stating that the motor vehicle licenses and registrations were public documents. As already noted, one of the crucial pieces of evidence linking Thompson to the conspiracy was his provision to Innamorati of registry checks on the license plates of vehicles of which Innamorati was suspicious. Thompson asked that the jury be told that "as a matter of law, motor vehicle licenses and registrations -63- -63- are public documents, and disclosure of their contents does not, in itself, violate the law." The only case on the point cited in Thompson's brief, Doe v. Registrar of Motor Vehicles, 26 Mass. App. Ct. 415, ____ ___________________________ 528 N.E.2d 880 (1988), actually stands for the proposition that the motor vehicle registry is not prima facie a public ___ _____ _____ record. In any event, the government did not charge Thompson with stealing government secrets; it was enough for it to show that Thompson's behavior in facilitating access to the registry was part of the conspiracy. There is no indication that the instructions as a whole misled the jury as to what was needed to convict on the conspiracy count. Second, Thompson challenges the district court's refusal to instruct that "mere proof of a buyer-seller relationship is not enough to convict one as a co-conspirator on drug conspiracy charges." This instruction is at best an incomplete statement of the law of conspiracy. Depending on the surrounding circumstances, a buyer-seller relationship could, in some cases, be the very core of a drug distribution conspiracy. See Moran, 894 F.2d at 1302-04. For this ___ _____ reason, courts that have approved the "buyer-seller" instruction have restricted its use to cases in which the evidence showed only a single or a very limited number of sales for personal use. See United States v. Canino, 949 ___ _____________ ______ F.2d 928, 941 (7th Cir. 1991), cert. denied, 112 S. Ct. 1701, ____ ______ -64- -64- 1940 (1992); United States v. Medina, 944 F.2d 60, 65-66 (2d _____________ ______ Cir. 1991), cert. denied, 112 S. Ct. 1508 (1992). ____ ______ In this instance, the gist of the conspiracy charge against Thompson was not his drug purchases as such but his other affirmative acts--notably, procuring cellular phones and performing license plate checks--that the government said were knowingly designed to assist Innamorati's extensive drug ring operations. We doubt whether the instruction Thompson sought is well tailored even for a case in which the conspiracy charge focuses on multiple purchases and the "defense" is personal use. The instruction is even less appropriate for the case actually presented against Thompson. Finally, Thompson complains in a cursory fashion of the trial court's responses to several questions posed by the jury during its deliberations. For example, although Thompson argues that a supplementary instruction on conspiracy was a "misstatement" of law, he fails to tell us how the statement was inaccurate. We find no prejudicial error here, nor with respect to each of Thompson's remaining objections to the judge's handling of the jury's inquiries. Next, Letters says that the court's supplemental instruction on the definition of "aiding and abetting," in response to a jury inquiry on the fourth day of deliberations, failed to tell the jury that some affirmative participation on the part of the defendant is required for -65- -65- conviction. Letters failed to object to the challenged language at trial. Once again confining our review to a search for plain error, we find none. The supplemental instruction adequately informed the jury of the requisite level of participation required to convict for aiding and abetting. Letters' underlying concern--that the jury be told that merely purchasing cocaine for personal use does not aid and abet the seller's possession with intent to distribute-- was specifically addressed by the court in the supplemental instruction immediately after the portion Letters challenges. Finally, Litterio and Boisoneau claim as error the district court's refusal to give their requested "accomplice testimony" instruction. From reading their briefs, one might get the impression that no "accomplice testimony" instruction was provided. In fact, the court admonished the jury at length on the need to weigh carefully the uncorroborated testimony of an accomplice and to consider the advantages that such witnesses might receive in exchange for their testimony. The court is not required to track the defendants' requested language so long as the jury is fairly informed of the pertinent law, United States v. Newton, 891 _____________ ______ F.2d 944, 951 (1st Cir. 1989), as it was in this instance. XIII. ADMISSION OF "DRUG LEDGER" AND TELEPHONE SUMMARIES Thompson devotes a half page in his brief to an argument that the court abused its discretion by allowing the -66- -66- government to introduce two items of evidence: first, a "ledger" and related evidence summarizing certain of the drug sales made by Tulowiecki; and second, evidence of telephone calls between various telephone numbers associated with the alleged conspiracy, as well as summary charts of that information. The drug "ledger" was a book maintained by Tulowiecki for about a month in the fall of 1987, in which Tulowiecki recorded cocaine sales, showing the purchaser (by code number), the amount of narcotics bought, the price and the date. When not using the ledger, Tulowiecki frequently recorded cocaine sales on slips of paper, a number of which were also introduced into evidence. In addition, Tulowiecki prepared for use at trial a summary of the transactions that were recorded in the ledger and on the slips of paper. Defendants did not object at trial to the introduction of the ledger and original papers, but they did object when the government sought to introduce Tulowiecki's summary. Thompson's brief does not identify any basis for concluding that the admission of these materials was error. The telephone evidence consisted of frequency reports showing the number of calls between various telephone numbers of persons and businesses associated with the conspiracy, as well as charts summarizing that information. Many courts have admitted this type of evidence in conspiracy cases. -67- -67- E.g., United States v. Porter, 821 F.2d 968, 975 (4th Cir. ____ _____________ ______ 1987), cert. denied, 485 U.S. 934 (1988); United States v. ____ ______ _____________ Drougas, 748 F.2d 8, 25-26 (1st Cir. 1984). Thompson argues _______ that the telephone records did not identify the specific persons who made or received the calls; but this merely limits and does not eliminate their relevance. Thompson also says that "testimony and exhibits made it clear that the compilation of numbers [in the government's summaries] did not match the phone records." But Thompson fails either to specify any respects in which the summary materials were inaccurate or to cite us any such "testimony and exhibits." XIV. "GUILT ASSUMING HYPOTHETICALS" Thompson argues that he is entitled to a new trial on account of the prosecutor's use, in Thompson's phrase, of "guilt assuming hypotheticals" during redirect examination of Lancaster Police Chief Eric Mcavene. During cross examination of Mcavene, Thompson's counsel sought to establish that it was a common practice for police officers to run registry checks on license plates, and that such checks were done for many different reasons including requests from the public. Mcavene admitted that registry checks were conducted for a variety of reasons and that he was not consulted in every instance. In response, government counsel sought to dispel the notion that registry information was freely disseminated. -68- -68- Pursuing that theme, the prosecutor asked Mcavene, "[I]f a known drug dealer had asked you for a Registry check, would you do it for him?" Before the witness could answer, the court upon objection ruled (mistakenly) that this question had already been asked. The prosecutor acquiesced and moved on to his next inquiry: "[I]f William Thompson had asked you for the Registry check would you have done it?" The court sustained Thompson's objection to this question, struck the question, and denied Thompson's motion for a mistrial. It may be a close call whether either of these questions was improper as an implied assertion that Thompson was a drug dealer, but we need not pursue the issue. Even if both questions were error, they did not conceivably have such a prejudicial impact as to require reversal. Neither question was answered by the witness, one was stricken from the record, and the court elsewhere instructed the jury that statements of counsel are not evidence. The precise limits on who could obtain registry checks was largely a side-show and Mcavene's attitude toward disclosure was a subject raised by Thompson's own counsel. XV. MARK LITTERIO EVIDENCE Litterio argues that the court erred by permitting the government to introduce evidence of a drug transaction involving Litterio's brother, Mark Litterio, as well as a statement made by Mark Litterio to an undercover officer. -69- -69- Litterio was convicted under count five of the indictment for possession of cocaine with intent to distribute. The primary evidence was Tulowiecki's testimony that Litterio purchased four ounces of cocaine from Innamorati in late August 1987. According to Tulowiecki, Litterio said at the time of the purchase that he was buying the cocaine for his brother Mark. To corroborate this testimony, the government offered testimony from a parade of police officers showing that Mark Litterio and an accomplice were involved in the sale of four ounces of cocaine just after James Litterio's purchase from Innamorati. Although the evidence of the Mark Litterio transaction was a major detour, the evidence was relevant to the charge against Litterio in count five. The fact that Mark Litterio sold four ounces of cocaine to undercover agents just after James Litterio bought the same amount from Innamorati strongly corroborated Tulowiecki's testimony. The only "prejudice" was the potential for distracting the jury with details of an uncharged crime, and this judgment is largely within the discretion of the trial judge. See United States ___ _____________ v. Bonneau, 970 F.2d 929, 935 (1st Cir. 1992) ("only rarely-- _______ and in extraordinarily compelling circumstances" should this court "reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect"). -70- -70- Litterio also challenges as hearsay the admission, through the testimony of one of the officers involved in the Mark Litterio undercover investigation, of Mark Litterio's contemporaneous statement that he was doing the four-ounce cocaine deal with his brother "Mickey" (James Litterio's nickname). This statement, however, was admissible against Litterio under Fed. R. Evid. 801(d)(2)(E), which excludes from the definition of hearsay "a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy." Litterio objects that there is nothing to show that Mark himself was a member of the Innamorati ring. But based on this single transaction James and Mark Litterio were evidently engaged in a conspiracy in which James supplied, and Mark sold, four ounces of cocaine.12 Mark Litterio's statement to the undercover officers was in furtherance of it. Whether this was a separate conspiracy or part of the larger Innamorati conspiracy makes no difference so far as the admissibility of the statement against James Litterio is concerned. XVI. REFERENCES TO "THE DEMARCOS" ____________________ 12Mark Litterio's statement itself may be considered in determining admissibility, see Bourjaily v. United States, ___ _________ _____________ 483 U.S. at 178-79, and in addition there was evidence that James Litterio stated to Tulowiecki that he (James Litterio) needed the four ounces for his brother Mark, and that Mark Litterio was followed to James Litterio's house immediately after James Litterio received the drugs from Tulowiecki. -71- -71- Robert DeMarco Jr. argues that he was deprived of a fair trial by repeated references to "the DeMarcos." He contends that these collective references deprived him of an individual adjudication of guilt or innocence, and instead grouped him together with his father as a single entity. We have examined the record and conclude that the phrase "the DeMarcos" was used as a substitute for "both Robert DeMarco Sr. and Robert DeMarco Jr.," and that this was made clear to the jury. For example, in one of the instances cited by Demarco Jr., Callahan testified that he distributed portions of two half-kilograms of cocaine to, among others, "the Demarcos." Upon counsel's objection to the collective reference, the prosecutor asked whether Robert DeMarco Sr. and Robert DeMarco Jr. "were both present" at the time of this distribution, and Callahan replied, "Yes." A witness may testify that two persons jointly performed a given act so long as confusion is avoided. Here, the witness was merely using the shorthand phrase "the DeMarcos" to refer to "both Robert DeMarco Sr. and Robert DeMarco Jr." When counsel objected, the witness made clear his meaning. We have examined the other instances cited by DeMarco Jr. and find them to be equally lacking in confusion or prejudice. XVII. EX PARTE PROCEEDINGS __ _____ After the trial concluded, the government discovered information in its possession that related to an incident -72- -72- recounted during the trial testimony of a government witness. Although the government believed that the information was not Brady material, it did not wish to conceal the information _____ from the court or take the final responsibility for appraising its importance. At the same time, the government feared that release of the information would pose a substantial danger of serious harm. Accordingly, the government submitted the information to the district court ex parte, described the reasons for its __ _____ position and explained why it feared disclosure. The district court ruled that the information was not material and that the government's justification for non-disclosure was persuasive. The district court sealed its order containing these rulings. At no time during this episode were defendants or their counsel made aware of these proceedings or of the court's order. The government's submission and the district court's order were forwarded to this court and brought to the attention of this panel. This court in turn issued an order on November 18, 1992, informing all defense counsel of the existence of the ex parte proceedings. Not surprisingly, __ _____ defendants have moved for disclosure of the information, or at the very least a synopsis of the information so that they may argue intelligently as to its materiality and the need for disclosure. Certain defendants also argue that the ex __ -73- -73- parte procedures utilized by the district court deprived them _____ of a fair trial. We sympathize with defendants' protestations and agree that the procedures utilized in this case raise extremely serious issues. Outside of emergencies, see Fed. R. Civ. P. ___ 65(b) (temporary restraining orders), the ex parte submission __ _____ of information from a party to the court and the court's ruling on that information without notice to or participation of the opposing party is fundamentally at odds with our traditions of jurisprudence, Haller v. Robbins, 409 F.2d ______ _______ 857, 859 (1st Cir. 1969), and can be justified only in the most extraordinary circumstances. Nevertheless, in rare situations requirements of confidentiality outweigh the interest in adversarial litigation and permit a court to rule on an issue in camera without the participation of an __ ______ interested party. For example, in United States v. Perkins, 926 F.2d 1271 _____________ _______ (1st Cir. 1991), the government possessed information that was arguably useful to impeach a government witness, but whose disclosure would have jeopardized an ongoing criminal investigation. The government submitted the information to the district court for an in camera determination of its __ ______ materiality. The court concluded that the information was not material and need not be disclosed. After trial-- presumably after the threat to the investigation had ceased-- -74- -74- the government's ex parte submission was unsealed and the __ _____ defendant was for the first time apprised of the information. On appeal we upheld the court's finding of immateriality and, implicitly, the procedure employed. There are other examples. Fed. R. Crim. P. 16(d)(1) expressly authorizes the court to deny discovery of information sought by a defendant based on an ex parte __ _____ showing by the government of the need for confidentiality.13 The Classified Information Procedures Act, 18 U.S.C. App. 1-16, permits the ex parte submission __ _____ of affidavits by the government in support of a protective order authorizing the non-disclosure of national security information. See United States v. Pringle, 751 F.2d 419, 427 ___ _____________ _______ (1st Cir. 1984). And under Franks v. Delaware, 438 U.S. 154 ______ ________ (1978), courts often make an in camera assessment of the __ ______ veracity of a confidential government informant and the harm from revealing his identity. See United States v. Southard, ___ ______________ ________ 700 F.2d 1, 10-11 (1st Cir.), cert. denied, 464 U.S. 88 _____________ (1983). The present case is unusual because not only were defendants denied access to the material but they did not even know of its submission to the court. We agree that the ____________________ 13See e.g., United States v. Napue, 834 F.2d 1311, 1317 ___ ____ _____________ _____ (7th Cir. 1987) (approving this procedure in appropriate cases). Rule 16(d)(1) requires the court to preserve the records of the ex parte communication for the appellate court __ _____ in the event of an appeal, as was done in this case. -75- -75- secret submission to the court is especially dangerous, depriving the opponent even of the opportunity to argue generally against the need for secrecy. Yet there is no question here of convictions based upon secret evidence furnished to the factfinder but withheld from the defendants. What the government did was to provide material to the court to permit the court to determine whether under applicable law the material needed to be produced to the other side and, collaterally, to determine whether there was a legitimate reason for continued secrecy in the submission. Each of the three judges on this panel has considered the information in this case bearing on these two issues. Our standard in this inquiry was to resolve every legitimate doubt in favor of the defendants precisely because they could not argue the matter for themselves. We nevertheless have concluded that there was a substantial threat of serious harm warranting the initial examination by the district court without notice to defendants; that the threat has abated sufficiently to justify notice to the defendants now but not the disclosure of the information itself; and that the information, whether or not technically Brady material, would _____ not have significantly assisted any of the defendants and could not conceivably have altered any of the verdicts. As for the government's action in submitting the information to the district court without notice to -76- -76- defendants, we would expect this dangerous course to be very rare indeed, but in this instance we find that it was justified and, given the unimportance of the material, it inflicted no prejudice on the defendants. No doubt we could construct a judicial rule forbidding the government, absent a statute or regulation, from making any secret submission. But we think that the interests of justice are better served by encouraging the government to let the district court resolve the Brady issue or like questions in close cases. _____ Defendants in general would not gain from a regime that encouraged the government to decide the matter itself. XVIII. SENTENCING ISSUES A. Introduction Thompson, DeMarco Sr., Letters, Litterio and Boisoneau challenge the district court's calculation of their sentences under the Sentencing Guidelines.14 Many of defendants' arguments concern the court's calculation of the amount of narcotics attributable to each defendant. It is useful to say a few words on the subject at the outset. Under the Guidelines, the sentence for a drug-related offense hinges substantially upon the total amount of drugs involved in that offense. See U.S.S.G. 2D1.1(c) (drug ___ ____________________ 14The district court applied the 1990 version of the Sentencing Guidelines and therefore all citations unless otherwise indicated are to that version. -77- -77- quantity table).15 This determination often turns on the "relevant conduct" provision of the Guidelines, which provides that a defendant's base offense level shall be determined on the basis of "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction . . . ." U.S.S.G. 1B1.3(a)(1). In the case of concerted criminal activity, conduct "for which the defendant would be otherwise accountable" includes "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." Id. __ comment note 1. Thus, "[t]he central concept . . . is foreseeability." United States v. O'Campo, 973 F.2d 1015, 1023 (1st Cir. ______________ _______ 1992). This means that each member of a drug distribution conspiracy may be held accountable at sentencing for a different quantity of narcotics, depending on the circumstances of each defendant's involvement. See U.S.S.G. ___ 1B1.3 comment note 1. The foreseeability determination is ____________________ 15Section 2D1.4 provides that if a defendant is convicted of conspiring to commit an offense involving a controlled substance, "the offense level shall be the same as if the object of the conspiracy or attempt had been completed." Section 2D1.1, in turn, sets forth the offense levels for the completed offenses of distribution and possession with intent to distribute based primarily upon the drug quantity table. -78- -78- inherently fact-bound, and "[a] district court's finding of the amount of drugs involved in an offense will be overturned on appeal only upon a showing of clear error." United States _____________ v. Tracy, 989 F.2d 1279, 1287 (1st Cir. 1993). "[W]here more _____ than one reasonable inference may be drawn from undisputed facts, the court's choice from among supportable alternatives cannot be clearly erroneous." United States v. McCarthy, 961 _____________ ________ F.2d 972, 978 (1st Cir. 1992). In this case, the court held an evidentiary hearing to determine the drug quantities attributable to each defendant. Callahan and Tulowiecki testified regarding the amounts of narcotics distributed to certain of the defendants. The court also relied heavily on detailed pre-sentence reports prepared by the probation officer. See Fed. R. Crim. P. ___ 32(c). Thereafter, the court issued a memorandum opinion setting forth its factual findings including "how much controlled substance is attributable to each defendant in order to establish his base offense level for Guideline purposes." Order of July 12, 1991 at 2. B. William Thompson Thompson first argues that the Sentencing Guidelines do not apply to him because the principal evidence against him-- the provision of registry checks and cellular phones-- occurred prior to November 1987, when the Sentencing Guidelines took effect. Thompson waived this claim by -79- -79- failing to make it during the sentencing process. See ___ Figueroa, 976 F.2d at 1462. In any event, the Guidelines ________ applied to Thompson, because he was a member of an ongoing conspiracy that continued past the effective date of the Guidelines and Thompson did not withdraw before the Guidelines became effective. See United States v. Thomas, ___ _____________ ______ 895 F.2d 51, 57 (1st Cir. 1990). Thompson next contests the calculation of the quantity of drugs for which he is accountable. Thompson's principal contributions to the venture did not lie in particular drug transactions but rather in the provision of services to Innamorati. Thompson helped Innamorati set up his communications network and ran license plate registry checks on prospective customers, and Thompson knew Innamorati was a large-scale distributor. Innamorati himself was responsible for the importation and distribution of approximately 16 kilograms of cocaine and 450 pounds of marijuana. The pre-sentence report concluded that Thompson purchased small quantities of cocaine for personal use amounting to approximately 46 grams. Further, Thompson admitted before the grand jury that he had been aware since 1983 or 1984 that Innamorati was distributing cocaine, and that he often was present in Innamorati's house when Innamorati possessed large amounts of cocaine. Based on these facts, the probation officer (and later the court) -80- -80- determined that it was reasonable to conclude that Thompson could have foreseen that Innamorati was dealing in multiple kilograms. Recognizing that it was engaged in a "highly speculative task," the probation officer determined that Thompson could reasonably have foreseen 3.2 kilograms of cocaine, based on the cocaine purchased and the cocaine he personally saw in Innamorati's house. We think the 3.2 kilogram finding is at the low end of the range of figures that might reasonably have been chosen. Thompson knowingly assisted Innamorati's drug ring operations, well aware that Innamorati was involved in the importation and distribution of large amounts of cocaine. He saw large caches of cocaine in Innamorati's home and made purchases for himself, and the district court treated Thompson favorably by limiting his accountability to these amounts. The computation of what Thompson himself saw and bought is necessarily an estimate but is hardly an implausible one. We see no error. Thompson argues that the court wrongly increased his base offense level under U.S.S.G. 3B1.3, which provides for a two-level enhancement if "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." The court based this enhancement on the fact that Thompson had worked as a Massachusetts Registry police -81- -81- officer from 1978 until some time around 1985 and used that position to gain access to the registry computer and provide license plate checks to Innamorati. Employment as a registry police officer clearly qualifies as a "position of public . . . trust" within the meaning of the Guideline. E.g., United States v. Rehal, 940 ____ _____________ _____ F.2d 1, 5 (1st Cir. 1991) (police sergeant). Although we have found no case law on point, we do not believe it matters that Thompson was no longer employed with the registry at the time he provided the information to Innamorati, so long as he abused the access that his former position afforded him. The Guideline itself does not limit its application to cases in which the defendant is employed at the time, and the underlying policy appears to apply to this case. If and when others among the public could gain access to motor vehicle information in the registry is not entirely clear. But the evidence at trial indicated that Thompson's prior employment made it easier for Innamorati to do so. There was police testimony that it was improper for anyone to perform a check without a valid law enforcement purpose, a test that Thompson's activities clearly did not meet. Given these facts, we do not believe that the sentencing judge committed clear error by concluding that Thompson abused a position of public trust. See Rehal, 940 F.2d at 5 (applying ___ _____ -82- -82- "clearly erroneous" standard of review to abuse-of-trust adjustment under section 3B1.3). Finally, Thompson argues that the court erred by failing to award him a four-level reduction as a "minimal participant" under section 3B1.2(a). A "minimal" participant is defined as one who is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. 3B1.2 comment note 1. A "minor" participant"-- defined as one "who is less culpable than most other participants, but whose role could not be described as minimal," id. (n.3) -- is entitled __ to a two-level reduction under U.S.S.G. 3B1.2(b). The Guideline also permits the court to award a three-level decrease to persons whose participation was more than minimal but less than minor. The four-level "minimal participant" adjustment was intended to be applied "infrequently"; an example given is an individual recruited as a courier for a single transaction in an larger enterprise. Id. note 2. __ Here, the court concluded that Thompson was not a "minimal participant" in light of his substantial assistance to and close association with Innamorati. At the same time, the court found that Thompson played a limited role in Innamorati's overall distribution activities, and was not shown to have cocaine himself or to have shared in the profits. The court was reasonable, indeed generous, in -83- -83- awarding Thompson a three-level reduction for persons falling in between the "minimal" and "minor" participant categories. C. Robert DeMarco Sr. DeMarco Sr. challenges the court's determination that he is accountable for 4.25 kilograms of cocaine. This finding was based on the testimony of Callahan at the sentencing hearing that he distributed an average of a quarter kilogram of cocaine per month to DeMarco Sr. from January 1987 through February 1988. It is unclear whether Callahan was including in this "average" one or both of two initial one-kilogram sales to DeMarco Sr. But the district judge resolved that uncertainty by concluding that one of the kilograms was included in the average and the other was not. This conclusion was not clearly erroneous. Indeed, Callahan testified: I would say the second full kilo was part of the average. But conservatively speaking, I would say you could exclude the first kilo and the average would still be quarter kilo a month. Thus, the sum of 4.25 kilograms was derived by totalling the quarter kilogram sales over a thirteen-month period (which amounts to 3.25 kilograms), and then adding the additional one-kilogram sale. Although there were discrepancies in Callahan's testimony as to the quantities and dates of drug sales to DeMarco Sr., "the court's choice from among supportable alternatives cannot be clearly erroneous." See ___ McCarthy, 961 F.2d at 978. ________ -84- -84- DeMarco Sr. also argues that the court abused its discretion by failing to award him the reductions provided under section 3B1.2 to "minor" or "minimal" participants. The district court was justified in concluding that DeMarco Sr. was a major customer whose monthly purchases of quarter kilograms of cocaine for more than a year helped keep the conspiracy in operation. Indeed, as the government points out, only two of the defendants--Innamorati and Grady--had more cocaine attributed to them at sentencing than DeMarco Sr. We find no error in the court's refusal to grant a downward adjustment. D. William Letters The court found that Letters was responsible for 510 grams of cocaine. This was less than a third of the amount attributed to Letters by the probation officer. Tulowiecki testified at trial that he delivered quarter, half or full ounces of cocaine at least weekly and often several times per week to Letters between January 1987 and February 1988. Taking an average of one ounce or 28 grams per week over this fourteen-month period, the probation officer determined that Letters should be held responsible for approximately 1588 grams. For reasons that are unexplained, the court reduced this amount to 510 grams. The court's reduction did not have a corresponding effect on Letters' sentence, however, since -85- -85- the Guidelines supply the same base offense level of 26 for any quantity between 500 grams and two kilograms. Despite Tulowiecki's testimony, Letters points out that the chart prepared from Tulowiecki's drug ledger reflected the sale of only 336.5 grams of cocaine to Letters. But it was clear from Tulowiecki's testimony at trial and at the sentencing hearing that the chart was incomplete; it showed only sales over a limited period of time and for which there were written records, not all sales. The chart showed sales to Letters only for the period June 1987 to February 1988, whereas Tulowiecki testified that deliveries were made to Letters starting in January 1987. In sum, although the basis for the court's calculation of 510 grams does not appear from the record, the evidence supported a determination of at least that amount. Letters also challenges the calculation of his criminal history category. On March 30, 1990, while Letters was released on bail pending trial in this case, he was arrested for possession of cocaine with intent to distribute. Letters was convicted of that offense in April 1991 and was serving a sentence on that conviction at the time of sentencing in this case. This new conviction increased Letters' criminal history by three points pursuant to U.S.S.G. 4A1.1(a), which directs the district court to "add 3 points for each prior sentence of imprisonment exceeding one year and one -86- -86- month." Combined with other pertinent information, this increase gave Letters a total of seven criminal points, placing him in Criminal History Category IV. Letters now argues that the March 1990 offense should not have been included in the calculation because under the Guidelines "prior sentences imposed in related cases" are to be treated as one sentence in the criminal history computation. U.S.S.G. 4A1.2(a)(2). Letters contends that the March 1990 offense was "related" to the conspiracy for which he was convicted in this case, and therefore should not have been separately considered in determining his criminal history. Letters, however, did not make this argument at sentencing, in response to the calculation of his criminal history in the Pre-sentence report or at the sentencing hearing before the district court. The argument was therefore waived. See Figueroa, 976 F.2d at 1462. Contrary ___ ________ to Letters' brief, the statutory provision permitting appellate review of sentencing errors, 18 U.S.C. 3742(e)(1), does not disturb the long-standing rule that claims must first be made in the district court to preserve them for review.16 ____________________ 16Even if the issue had not been waived, there is substantial reason to believe that Letters' March 1990 offense occurred after the end of the Innamorati conspiracy. The DEA search warrants were executed in February 1988 and by March 1988 Innamorati was in prison on a state-court conviction. -87- -87- E. James Litterio Litterio contends that there was insufficient evidence to support the district court's determination that he is responsible for 1.7 kilograms of cocaine. The 1.7 kilogram figure is based on Tulowiecki's testimony that he delivered small amounts of cocaine to Litterio several times a week between January 1987 and February 1988 (based on a conservative estimate of 10 grams per week, the total amount was fixed at 600 grams); on evidence that Litterio provided four ounces (112 grams) of cocaine to his brother Mark that were then sold to undercover agents; and on Tulowiecki's testimony that soon after the four-ounce deal Litterio ordered an additional kilogram of cocaine from Innamorati, although the deal was canceled when it was discovered that undercover officers might be involved. Although Litterio argues that he should not be held responsible for cocaine that he purchased for personal use, this confuses the standard for criminal liability with that for sentencing accountability. Purchases by an addict or casual user for personal use may not automatically make one a member of a conspiracy to distribute. The situation is quite different where, as here, the evidence shows that there was a conspiracy and that a defendant was a member. At that point, that defendant's purchases for personal use are relevant in -88- -88- determining the quantity of drugs that the defendant knew were distributed by the conspiracy. F. John Boisoneau The court held Boisoneau responsible for 316.52 grams of cocaine and sentenced him to 33 months imprisonment, which was at the bottom of the applicable range. The calculation of 316 grams included approximately 250 grams of cocaine that Boisoneau observed on one occasion while visiting the Edgewater Hills safehouse. When Boisoneau saw this "hunk" of cocaine he told Innamorati to put it away because it made him nervous. Boisoneau argues that in light of his reaction to the 250 grams of cocaine it was unreasonable for the court to hold him accountable for that amount at sentencing. The standard in computing the quantity of drugs is the amount of cocaine that Boisoneau reasonably should have foreseen to have been embraced by the conspiracy that he entered. See O'Campo, 973 F.2d at 1026. The 250 grams of ___ _______ cocaine that Boisoneau observed in Innamorati's safehouse is reasonably included in determining the total amount of cocaine that Boisoneau could have foreseen, regardless of whether the amount made him nervous. If there were evidence that Boisoneau effectively withdrew from the conspiracy after he saw the "hunk" and realized the scope of Innamorati's operation, this would be a different case, but there is no evidence of any such withdrawal. -89- -89- * * * In these ten appeals, somewhere between 50 and 100 points were raised by individual defendants, although there is some overlap. We have addressed those that appeared substantial and we have considered without discussion a number of others that were plainly without merit, were raised in a perfunctory fashion, or both. Because of the number of claims, the defendants' briefs were reviewed again after the opinion was prepared to make certain that no claim of error was overlooked. The judgments are affirmed except that _________________________________________ the judgment of conviction of defendant Grady on Count 4 is _____________________________________________________________ vacated and his case is remanded for resentencing. _________________________________________________ -90- -90-