November 8, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1769

UNITED STATES OF AMERICA,

Appellee,

v.

FRANK ORETO, SR.,

Defendant, Appellant.

No. 91-1770

UNITED STATES OF AMERICA,

Appellee,

v.

FRANK ORETO, JR.,

Defendant, Appellant.

No. 91-1771

UNITED STATES OF AMERICA,

Appellee,

v.

DENNIS PETROSINO,

Defendant, Appellant.

CORRECTED ERRATA SHEET CORRECTED ERRATA SHEET

The opinion of this Court issued on October 4, 1994, is
amended as follows:

Page 2 of the Cover Sheet, line 5: Change the name
"Dinisco" to "DiNisco".

Page 3, lines 9-10: Delete the words "Hobbs Act".

Page 3, line 11: After the number "894" add the words "(the
extortionate credit transactions or "ECT" statute)".

Page 8, line 12: Add the word "an" before the word
"additional".

Page 11, line 22: Substitute "2" for "12".

Page 17, lines 17-18: Replace the words "Hobbs Act" with
the words "ECT statute".

Page 23, line 7: Substitute " 892," for " 1892,".

Page 23, line 25: Replace the words "Hobbs Act" with the
words "ECT statute".

Page 24, line 8: Add the word "by" after the word
"employed".

Page 29, line 16: Delete the quotation marks after the word
"plus".

Page 30, line 17: Delete the word "moreover,".

Page 30, line 18: Change the words "`Bible' and Daniel" to
"`Bible'; and Daniel".

On the following pages and lines, substitute "ECT" for
"Hobbs Act": Page 4, lines 7 and 10; page 6, line 16; page 15,
lines 15, 18 and 22; page 17, lines 1, 5 and 11; page 18, line
21; page 22, line 8; page 27, line 23; page 28, lines 2, 4, 8-9
and 12. 

October 26, 1994
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1769

UNITED STATES OF AMERICA,
Appellee,

v.
FRANK ORETO, SR.,

Defendant, Appellant.

No. 91-1770
UNITED STATES OF AMERICA,

Appellee,
v.

FRANK ORETO, JR.,
Defendant, Appellant.

No. 91-1771

UNITED STATES OF AMERICA,
Appellee,

v.
DENNIS PETROSINO,

Defendant, Appellant.

ERRATA SHEET ERRATA SHEET

The opinion of this Court issued on October 4, 1994, is amended
as follows:

Page 2 of the Cover Sheet, line 5: Change the name "Dinisco" to
"DiNisco".

Page 3, lines 9-10: Delete the words "Hobbs Act".

Page 3, line 11: After the number "894" add the words "(the
extortionate credit transactions or "ETC" statute)".

Page 8, line 12: Add the word "an" before the word "additional".

Page 11, line 22: Substitute "2" for "12".

Page 17, lines 17-18: Replace the words "Hobbs Act" with the
words "ETC statute".

Page 23, line 7: Substitute " 892," for " 1892,".

Page 23, line 25: Replace the words "Hobbs Act" with the words
"ETC statute".

Page 24, line 8: Add the word "by" after the word "employed".

Page 29, line 16: Delete the quotation marks after the word
"plus".

Page 30, line 17: Delete the word "moreover,".

Page 30, line 18: Change the words "`Bible' and Daniel" to
"`Bible'; and Daniel".

On the following pages and lines, substitute "ETC" for "Hobbs
Act": Page 4, lines 7 and 10; page 6, line 16; page 15, lines 15, 18
and 22; page 17, lines 1, 5 and 11; page 18, line 21; page 22, line 8;
page 27, line 23; page 28, lines 2, 4, 8-9 and 12.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1769
UNITED STATES OF AMERICA,

Appellee,
v.

FRANK ORETO, SR.,
Defendant, Appellant.

No. 91-1770

UNITED STATES OF AMERICA,
Appellee,

v.
FRANK ORETO, JR.,

Defendant, Appellant.

No. 91-1771
UNITED STATES OF AMERICA,

Appellee,
v.

DENNIS PETROSINO,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS
[Hon. David S. Nelson, U.S. District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.


Charles W. Rankin, by Appointment of the Court, with whom Rankin
& Sultan, Cornelius H. Kane, Jr, and Charles P. McGinty, Federal
Defender Office, were on consolidated brief for appellants.
Sean Connelly, Department of Justice, with whom Donald K. Stern,
United States Attorney, Ernest S. DiNisco and Todd E. Newhouse,
Assistant United States Attorneys, were on brief for the United
States.

October 4, 1994


BOUDIN, Circuit Judge. Frank Oreto, Sr., Frank Oreto,

Jr., and Dennis Petrosino ("the appellants") challenge their

convictions on a number of charges arising out of an alleged

loansharking ring operating in Revere, Massachusetts. We

affirm.

I. BACKGROUND

The appellants were charged in June 1987 in an

indictment with offenses under the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962, as well

as offenses involving the making of extortionate loans or

collection by extortionate means. 18 U.S.C. 892, 894 (the

extortionate credit transactions or "ECT" statute). The

original indictment was 137 pages long, contained 82 counts,

and named several other defendants besides the three who are

parties to this appeal. The structure of the charges is of

some importance.

Count 1 alleged a RICO conspiracy involving all of the

indicted defendants. The alleged predicate acts were 74

specific instances of extortionate lending or collection

transactions in violation of 18 U.S.C. 892, 894, and 62

specific instances of usurious lending as defined in 18

U.S.C. 1961(6). Count 2 charged each of the indicted

defendants with a substantive RICO violation and realleged

the same conduct as predicate acts. Counts 3 through 76 then

alleged each of 74 extortionate lending or collection

-7- -7-

transactions as individual conspiracies to violate 18 U.S.C.

892, 894, or--in ten instances--as individual extortionate

collections by Oreto, Sr. in violation of the latter statute.

(Counts 76-82 involved mail fraud charges against indicted

defendants other than the three appellants.)

Oreto, Sr., was named in most of the 74 transactions

that formed the basis for the RICO conspiracy, the

substantive RICO offense, and the 74 separate ECT statute

counts. Oreto, Jr., and Petrosino were also named in the

RICO conspiracy and RICO substantive counts and in a limited

number of the 74 transactions and the corresponding ECT

statute conspiracy counts. All three of the appellants

appeared in various of the 62 usurious loan transactions that

were also alleged predicate acts in counts I and II but were

not charged as separate conspiracies or substantive crimes in

any other count.

One of the defendants named in the indictment was

severed and tried separately. See United States v. Weiner, 3

F.2d 17 (1st Cir. 1993). Several other defendants

disappeared from the case for reasons not stated in the

briefs; at least one pleaded guilty and testified against

those who stood trial. The three appellants in this case

were tried together in a 143-day trial. At trial the

government offered seized records of loans and borrowers,

court-authorized wiretap recordings, and testimony by

-8- -8-

cooperating co-conspirators and individuals who had borrowed

money from Oreto, Sr. We state the facts in the light most

favorable to verdicts being appealed. Weiner, 3 F.2d at 19.

So viewed, the evidence permitted a reasonable jury to

find the following. Oreto, Sr. headed an enterprise which

made loans to over three hundred borrowers at weekly interest

rates of from three to seven percent. Those weekly rates

translate into annual interest of from 156 to 364 percent;

the maximum legal rate in Massachusetts, by contrast, is 20

percent annually. Mass. Gen. Laws. ch. 271, 49. Oreto,

Jr. and Petrosino served as collectors for the loansharking

operation. Over two dozen borrowers testified, various of

them asserting that Oreto, Sr. and his accomplices used

threats and intimidation to ensure payment of the loans.

The loansharking business was conducted from various

locations in or near Revere including both Oreto, Sr.'s home

and a function hall in which Oreto, Sr. was a silent partner.

The documentary evidence included the organization's "Bible,"

its master list of borrowers, debts, salaries and expenses.

"Frank, Jr.," and "Dennis" were listed among those who

received weekly salaries. Much of the trial was given over

to testimony by borrowers whose loans were corroborated by

entries in the Bible.

These witnesses testified that Oreto, Sr. employed tall,

physically imposing men--Petrosino, for example, is described

-9- -9-

in the record as between 6'1" and 6'2" tall and over 250

pounds in weight--to call upon delinquent borrowers and

threaten them--implicitly or explicitly--with physical harm

if the loans were not repaid. At least two witnesses

testified that they were physically assaulted by Oreto, Sr.'s

collectors, and many more borrowers testified that they

believed that harm would come to them if they failed to make

their payments.

The jury convicted each of the appellants on one count

of conspiring to violate RICO, 18 U.S.C. 1962(d), as well

as one substantive RICO count. 18 U.S.C. 1962(c). In

addition, Oreto, Sr. was convicted on 35 counts of conspiring

to collect loans by extortionate means, 18 U.S.C. 894; ten

counts of making extortionate loans, 18 U.S.C. 892; and

three counts of conspiring to make extortionate loans. Id.

The jury also convicted Oreto, Jr. on four counts, and

Petrosino on seven counts, of conspiring to collect loans by

extortionate means. At a later date, Oreto, Sr. was

sentenced to 20 years imprisonment on the RICO counts, to run

concurrently with 15 year sentences on the individual ECT

statute counts but consecutively to a life sentence he was

then serving in Massachusetts state prison for second degree

murder. Oreto, Jr. and Petrosino were sentenced to 6 years

and 10 years imprisonment, respectively, on each count of

-10- -10-

conviction, with all sentences to run concurrently. These

appeals followed.

II. THE MISCONDUCT CLAIMS

Appellants' first argument on appeal is that they were

prejudiced by prosecutorial misconduct involving in-court

identifications of them by a series of former borrowers. The

first indication of such misconduct occurred on March 29,

1990--three months into the trial--when an assistant United

States attorney asked John Doherty, a Revere fireman alleged

to have borrowed money from Oreto, Sr., to make an in-court

identification. Doherty had testified that a man named

"Dennis" had visited him on one occasion at work but, when

asked to identify Dennis, Doherty erroneously pointed to

Oreto, Jr.

On cross-examination, Doherty testified that he had been

told prior to entering the courtroom that the government

wished him to identify Petrosino, and that the seating

arrangement of the appellants at their counsel tables had

been described to him by an FBI agent who had been assisting

the prosecutors at trial. Doherty's confusion appears to

have arisen from the fact that there was more than one

defense table. Oreto, Jr. was sitting in the same position at

his table as Petrosino--the second seat from the right--but

at a different table. The defense moved for a mistrial and

requested a hearing on the issue.

-11- -11-

At a hearing beginning on April 2, 1990, the FBI agent

acknowledged that he had told Doherty the seating arrangement

of appellants prior to Doherty's entry into the courtroom.

This was done ostensibly for the purpose of reducing the

witnesses' nervousness by familiarizing them with the

courtroom layout. The agent also admitted conveying the

seating arrangement to two other witnesses. One was Joseph

Gazza, who had testified prior to Doherty and identified

Oreto, Sr., and the other was Michael DiCarlo, whom the

government chose not to call.

Two other witnesses testified at the hearing that they

had known where the defendants would be sitting: Ronald

Filipowich, who identified Oreto, Sr., and Frank Anderson,

who identified both Oreto, Sr. and Petrosino. Anderson,

however, said that he had such knowledge only because his

experience as a police officer, and Filipowich said that he

knew only that the defendants would be sitting in the "back"

of the courtroom. Later on, in May 1990, an additional

witness, Dennis Willcox, admitted that the FBI agent had told

him the courtroom seating arrangements two or three months

earlier. Willcox, however, was never asked to identify

anyone.

Following the hearing, the district court denied

defendants' motions for a mistrial and instructed the jury as

follows:

-12- -12-

Four witnesses--Mr. John Doherty, Mr. Joseph Gazza,
Mr. Frank Anderson, Mr. Ronald Filipowich--gave
testimony in the case before you. Each was asked
to identify Mr. Frank Oreto, Sr., and each gave a
reply. Prior to that session the Government team
told Mr. Doherty, Mr. Gazza, Mr. Anderson, and Mr.
Filipowich the seating arrangements of the
defendants. Now, you must be instructed as to the
following:

First, identification is an essential element that
the Government must prove beyond a reasonable
doubt.

2. You are to consider that evidence that seeks to
prove that, and you must carefully weigh the testi-
mony in determining what weight you shall give that
testimony as you review it in your deliberations.

Suggestions as to identification may [a]ffect an in
Court identification by making it the result of the
suggestion rather than that which the witnesses
actually saw or observed. Your responsibility is
to determine from all the evidence whether or not
the identifications made by the witnesses were
based on their own actual knowledge and memory, and
not on information provided them about the seating
positions of the defendants provided by the
Government.

Therefore, you may consider the fact that the Gov-
ernment told the witnesses Doherty, Gazza,
Anderson, and Filipowich about the seating
arrangements of the defendants, and of Mr. Oreto,
Sr. in particular, as you go about deciding how
much weight and relevance you will give to those in
Court identifications.

The district court's final charge to the jury included a

similar instruction. The court rejected the defense's

objections to this instruction, as well as alternative

instructions proffered by defense counsel.

Appellants now contend that the government's conduct

required a mistrial. Ordinarily, we will reverse a district

-13- -13-

court's denial of a motion for a mistrial only for an abuse

of discretion. E.g., United States v. Castiello, 915 F.2d 1,

3 (1st Cir. 1990), cert. denied, 498 U.S. 1068 (1991). The

government assumes, solely for purposes of this appeal, that

the revelation of defendants' seating arrangements to

identification witnesses was improper. It argues, however,

that there was no prejudice to any of the appellants.

We think this assertion is clearly correct with respect

to Oreto, Jr., who was not identified by any of the witnesses

who were told of the seating arrangement. It is equally

evident that Petrosino was not harmed by the allegedly

"staged" identifications: Doherty's misidentification of

Oreto, Jr. as Petrosino can have only undermined the

government's case against Petrosino. The only other disputed

identification of Petrosino--by Anderson--occurred in

connection with a count upon which Petrosino was not

convicted.

The identifications of Oreto, Sr. present a slightly

more difficult problem. Four of the five arguably tainted

witnesses pointed out Oreto, Sr. for the jury, and Oreto, Sr.

was convicted on three of the four counts to which those

witnesses testified. This court must therefore determine

whether the identification procedure was impermissibly

suggestive, and, if so, whether the identifications were

nonetheless reliable under all of the circumstances. E.g.,

-14- -14-

United States v. Gray, 958 F.2d 9, 13-14 (1st Cir. 1992). On

the latter issue, we conclude that the identifications of

Oreto, Sr. made were sufficiently reliable and the curative

instructions were such that a mistrial was not required.

This is not a case in which a marginal identification--

e.g., by a witness who only glimpses the perpetrator of a

crime--has been bolstered by improperly suggestive

identification procedures. See Neil v. Biggers, 409 U.S.

188, 199-200 (1972). Here, the witnesses identifying Oreto,

Sr. had dealt with him on numerous occasions and without any

attempt by Oreto, Sr. to mask his identity. These dealings

were corroborated by documents seized by the government.

Indeed, Oreto, Sr. did not claim that someone else had made

the loans in question, but rather that those transactions had

never involved threats or violence. Finally, defense counsel

were given ample opportunity to explore the defects in the

identification procedure on cross-examination and argue those

defects to the jury in summation.

Appellants also assert that the trial court improperly

foreclosed inquiry into "continuing misconduct in the

identification process" by the government. Specifically,

they argue that the court should have ordered Doherty, Gazza,

Anderson, and Filipowich to return to the stand after the

hearing in order to determine whether any part of their

testimony remained untainted. Appellants do not explain what

-15- -15-

they would have asked these witnesses during such further

testimony, over and above the thorough cross-examination

conducted during the witnesses' initial testimony.

One assistant United States attorney testified at the

April 2 hearing. Appellants complain that a second

prosecutor, who was co-counsel at the trial, should have been

ordered to testify. This testimony appears to have been

sought only to clarify certain details as to what information

was given to which witnesses. The government has asked us,

as it asked the trial court, to resolve all of these ambigu-

ities in the defense's favor and assume that each such

witness was told exactly where each defendant would be

sitting. The additional testimony sought by appellants could

not have given them more.

Appellants next say that the similar wording in

testimony given by several witnesses regarding the fear

element of the extortion counts may have indicated additional

government "coaching" of witnesses, and that the trial court

frustrated efforts to inquire into such misconduct. Several

of the witnesses testified that they feared that "harm would

come to them" if they did not repay their loans. Appellants

say that this syntax as unnatural, suggesting that its source

lay with the prosecution rather than the natural recollection

of the witnesses involved.

-16- -16-

A number of other witnesses testified using entirely

different formulations, and the fear element was amply

supported by additional evidence. Debtor Lloyd Plotkin, for

example, stated in an intercepted conversation with John

Costa, a manager in the loanshark organization, that he was

"afraid" of being "hit" and "slapped" by Oreto, Sr. Similar-

ly, other debtors testified at trial that violent means had

actually been employed against them. The defense had an

adequate opportunity on cross-examination to explore any

misconduct that might discredit the witnesses, and no further

fishing expedition was required.

The appellants also complain that they were not allowed

to call the assistant United States attorneys trying the case

as trial witnesses to testify about misconduct in the

identification process. A defendant must establish a

"compelling need" before being allowed to call a prosecutor

as a trial witness, a step that will usually require the

prosecutor to step aside. United States v. Angiulo, 897 F.2d

1169, 1194 (1st Cir.), cert. denied, 498 U.S. 845 (1990).

Here, the court dealt with the suggestive identifications

through the hearing and instructions. We think that this was

sufficient.1



1When the prosecutor testified at the April 2 hearing,
he disclosed that Doherty had described the individual named
"Dennis" who visited him at work--allegedly, Petrosino--as
large, dark-haired and "Irish looking." Petrosino argues
that the government violated Brady v. Maryland, 373 U.S. 83

-17- -17-

Appellants further contend that, in his closing

arguments to the jury, one of the prosecutors effectively

testified himself by saying, as to the tainted identifi-

cations, "Nobody attempted to cover it up, ladies and

gentlemen. Nobody lied." This was mild vouching, but we see

the statement as essentially harmless, especially in light of

the defense's repeated attempts to magnify the alleged

government misconduct and make it the focus of the case.

Reversal is not automatically required where improper remarks

by prosecutor are isolated and made in response to specific

attacks by defense counsel. United States v. Machor, 879

F.2d 945, 956 (1st Cir. 1989), cert. denied, 493 U.S. 1081

(1990).

At the close of the evidence, the defense proffered two

proposed instructions to be given by the trial court

regarding government misconduct in the identification

process. The first of these stated in part as follows:

It is improper for the government to tell a witness
where a defendant is sitting in the courtroom. I
have found that such conduct occurred here on four
specific occasion, affecting the testimony of Mr.
Doherty, Mr. Gazza, Mr. Anderson and Mr.
Filipowich. I now instruct you that attempts by
"the Government team" . . . to conceal or make up
evidence, or to influence witnesses to testify
favorably to the government, may be considered by



(1963), by failing to disclose Doherty's prior description to
the defense (so it could point out that Petrosino did not
look Irish). We agree with the district court that in the
context of this case the supposed characterization was too
vague to qualify as exculpatory under Brady.

-18- -18-

you as reflecting an attempt to unfairly convict a
defendant.

. . . .

You must consider the number and extent of efforts
to change or influence witnesses' testimony. To do
this, you must evaluate the testimony of each wit-
ness in this case, deciding whether any tampering
may have affected each and every identification as
well as any other evidence you have heard or re-
viewed during the trial. Evidence of such
tampering alone may create a reasonable doubt of
the defendant's guilt.

A second proposed instruction concluded by stating that "[i]f

such government misconduct together with any other facts

adduced in support of this defense creates in your mind a

reasonable doubt of guilt of these charges, then you must

find the defendants not guilty of these charges."

Both of the proposed instructions invited the jury to

acquit the defendants primarily or solely on the basis of

misconduct by the government. Here, as in an earlier case

"[the] facts making up the theory, if believed, [would] not

defeat the factual theory of the prosecution." United States

v. Silvestri, 790 F.2d 186, 192 (1st Cir.), cert. denied, 479

U.S. 857 (1986). Putting the government on trial is a

favorite strategy of defense counsel, but it is not an

exculpatory theory which the defense is entitled to have the

judge formally present to the jury. See United States v.

Porter, 764 F.2d 1, 14 (1st Cir. 1985). 

III. THE MERITS AND RELATED ISSUES

-19- -19-

Our discussion of the merits begins with the ECT statute

counts which, although listed later in the indictment, were

incorporated in the RICO counts as potential predicate acts.

Most of the ECT statute counts charged individual

conspiracies either to make extortionate extensions of credit

or to collect such extensions by extortionate means.

Appellants now claim that they were improperly charged and

convicted of multiple ECT statute conspiracies, whereas in

reality there were no distinct agreements separate from a

single overall loansharking conspiracy.

We have said that "[w]hether a given body of evidence is

indicative of a single conspiracy, multiple conspiracies, or

no conspiracy at all is ordinarily a matter of fact." United

States v. David, 940 F.2d 722, 732 (1st Cir.), cert. denied,

112 S. Ct. 605 (1991). It is true that if no reasonable jury

could on the evidence presented find the multiple

conspiracies charged, then a judgment of acquittal would be

warranted. It is a "heavy burden" to show that the evidence

precludes the findings made by the jury. United States v.

Innamorati, 996 F.2d 456, 469 (1st Cir.), cert. denied, 114

S. Ct. 409 (1993). Appellants here do not even try to carry

that burden.

Much of the trial was consumed by government evidence

directed to individual transactions. The appellants' brief

does no more with the evidence than point to connections

-20- -20-

between the credit transactions, including similarity of

methods, overlap of personnel, a general time frame, and

common locations. These factors might have justified the

jury in finding only one large conspiracy. They hardly show

that the jury could not find the requisites of smaller

individual conspiracies: a specific agreement, and the

required intent, as to each loan transaction.

The appellants' brief quotes from statements by

government counsel to the jury, arguing that the evidence

shows the connections necessary to prove the overarching RICO

conspiracy charged in count 1. But the requirements for a

RICO conspiracy are different than the requirements for a ECT

statute conspiracy, whether the latter relates to a single

transaction or one that embraces a number of transactions.

Here there is no inconsistency in the government arguing

that--in addition to the RICO conspiracy--individual ECT

statute conspiracies have also been proved.

The second branch of appellants' multiplicity argument

is an attack on the jury instructions. Appellants say that

even if the evidence permitted a finding of separate

conspiracies, the defense was entitled to instructions that

set forth the defense theory that there was (at most) only

one ECT statute conspiracy. Further, they say, the court was

obliged to give the jury guidance, as reflected in proposed

defense instructions, on how to distinguish between one large

-21- -21-

conspiracy and several smaller ones. The two instructions in

question--numbers 12A and 23--are lengthy and overlapping;

the former is concerned with RICO and the latter with the ECT

statute. The district court gave neither.

In substance, each of the requested instructions asks

the jury to determine "whether two or more charged

conspiracies are really the same offense"; both set forth the

multiple factor test that this and other courts have used in

considering double jeopardy claims in the conspiracy context;

and both refer to the possibility that the jury could find

"that the multiple conspiracies charged in the indictment

were not separate and distinct." One of the instructions

cited United States v. Gomes-Pabon, 911 F.2d 847, 860 (1st

Cir.), cert. denied, 498 U.S. 1074 (1991), which discussed

the multi-factor test.

It is common practice, especially in drug cases, for the

government (because of various procedural advantages that

inhere) to charge a single large conspiracy. In turn, the

defendants often claim that, at worst, only smaller (often

uncharged) conspiracies existed. Where requested, trial

courts may then give a so-called multiple conspiracies

charge, inviting the jury to consider the possibility that

the large conspiracy has not been proved but instead that

only smaller conspiracies may have been shown. 1 L. Sand, J.

Siffert, W. Loughlin & S. Reiss, Modern Federal Jury

-22- -22-

Instructions 19-01, at 19-24 to 19-34.3 (1993). See

generally Kotteakos v. United States, 328 U.S. 750, 773-74

(1946).

By contrast, we are concerned here with the defense

proposing an instruction that contemplates a larger single

conspiracy. The government thinks that it is enough, in this

case, that the jury was properly instructed on the elements

of each type of conspiracy charged (namely, the RICO

conspiracy and the various ECT statute conspiracies), and

that the jury was also told to acquit if it found that a

conspiracy as charged had not been proved. It quotes from

the district court's instructions:

If you find that any defendant participated in
a conspiracy but it was different from those
charged in the indictment, that determination would
provide no basis for finding that defendant guilty
of the offense charged.

If you find that the conspiracy charged did
not exist, then you must return a verdict of not
guilty even though you find that some other
conspiracy did, in fact, exist.

The government concludes that "[i]f an individualized

conspiracy is established, it is not a legitimate defense

that the defendant engaged in a broader conspiracy involving

multiple victims."

This position has some appeal, but it does not entirely

meet the reality that a jury's choice may be influenced by

the alternatives presented. Thus, "[a]n accused is entitled

to an instruction on his theory of defense so long as the

-23- -23-

theory is a valid one and there is evidence in the record to

support it." United States v. Rodriguez, 858 F.2d 809 (1st

Cir. 1988). Similarly, a defendant has a right to a lesser

included offense charge, where the evidence would permit a

jury to find that only a lesser included offense occurred.

E.g., Keeble v. United States, 412 U.S. 205 (1973). If such

instructions were warranted but nevertheless omitted, it

would not be an answer to say that the jury convicted and

that the evidence was sufficient to support the conviction.

The question what a district court should tell a jury,

where multiple conspiracies are charged but the defense urges

a single large conspiracy, is a difficult one and is probably

not susceptible to an abstract answer unrelated to context.

One reason is that quite different situations may be

presented: for example, the colorable "single large

conspiracy" might in one case be an entirely different entity

with different actors and objectives and, in another, be

nothing more than a different characterization of the very

same acts charged as multiple conspiracies. In the former

case, the charge in the two indented paragraphs quoted above

would probably protect the defendants pretty effectively even

without a specific reference to a "single" conspiracy.

Our situation is more akin to the latter case. At best,

the defendants have engaged in a series of transactions that

could be viewed as a set of separate conspiracies, or one

-24- -24-

overall conspiracy embracing numerous wrongful transactions,

or (putting double jeopardy issues to one side) both an

overarching conspiracy and a nest of underlying smaller

conspiracies. Partly this is a problem of proof and

inference; partly the problem arises from trying to squeeze

into the conceptual cubbyhole of "an agreement" activities

that in practice often have the more shapeless character of

an evolving joint criminal enterprise. See United States v.

Sepulveda, 15 F.3d 1161, 1191 (1st Cir. 1993), cert. denied,

114 S. Ct. 2714 (1994); United States v. Moran, 984 F.2d

1299, 1300 (1st Cir. 1993).

In all events, in such a case as ours we do not think

that a defendant--even if arguably entitled to a "single

conspiracy" instruction--is entitled to what the defense

sought here, namely, a direction to the jury to acquit if it

finds that the "two or more charged conspiracies are really

the same offense." If the various charged conspiracies are

really parts of the same conspiracy, then at worst the

defendant has been charged twice or more with the same

offense and can be convicted (or at least punished) only for

one conspiracy. Cf. Ball v. United States, 470 U.S. 856,

864-65 (1985). An outright acquittal on all counts would be

miscarriage of justice.

Both of the instructions sought here are fundamentally

flawed because they sought a direction to the jury to acquit

-25- -25-

if it found a single conspiracy. The law is well settled,

and for rather obvious reasons, that the district judge is

not required to edit a proposed instruction to delete the bad

and preserve the good. United States v. Flaherty, 668 F.2d

566 (1st Cir. 1981); United States v. Leaching, 427 F.2d 1107

(1st Cir. 1970). Rather, to preserve an ordinary claim of

error based on the refusal to give an instruction, counsel

must proffer a substantially correct statement of the law.

The acquittal direction alone makes the defense instructions

improper in the context of this case.

The request for a "single conspiracy" instruction is

likely to be rare. Usually, as already noted, the government

presses this theory and the defense resists; it was sought by

the defense here because the defense thought (mistakenly, as

we explain below) that a single conspiracy would insulate the

defendants against a RICO conviction. Accordingly, we think

that we can properly put off to another day the very

difficult problem of deciding whether and when such a single

conspiracy instruction should be given, a problem fraught

with practical difficulties in explaining matters to the jury

as well as the theoretical ones to which we have adverted.

One other general claim of error relating to the ECT

statute counts remains to be considered. In order to prove

that an extension of credit was extortionate under 18 U.S.C.

892, the government was obligated to prove that the debtor

-26- -26-

(as well as the defendant) believed that the debt might be

collected, or that nonpayment might be punished, by

extortionate means, that is, by violence or other harmful

criminal means. 18 U.S.C. 891(b). This element was

contested at trial. Over defense objection, the trial court

allowed one of the alleged loanshark borrowers, Joe Gazza, to

testify that he knew Oreto, Sr. "got out of jail for murder."

This testimony was elicited by the government on

redirect, after Gazza admitted on cross-examination that he

had never been directly threatened. The redirect was

admitted by the trial court solely for the purpose of showing

a basis for Gazza's fears that Oreto, Sr. might resort to

violence to ensure repayment. Appellants now challenge the

trial court's admission of the testimony, noting its highly

prejudicial nature and the lack of any connection between the

prior murder and Oreto, Sr.'s alleged loansharking

activities.

Appellants' argument is largely foreclosed by our

decision in United States v. DeVincent, 546 F.2d 452 (1st

Cir. 1976). In that case, which also involved allegations

that the defendant made extortionate extensions of credit in

violation of 18 U.S.C. 892, the trial court admitted

testimony regarding the defendant's twenty-year-old

conviction for armed robbery and his ten-year-old murder

indictment. Upholding this decision, Judge Coffin explained:

-27- -27-

Neither of the events could be admitted to show
that DeVincent was a bad man. If known to the
debtor, however, they can be admitted to show an
element of the crime--the understanding of the
debtor that default would be punished with
violence. The debtor's awareness of the lender's
earlier conviction, or even indictment, for a
violent crime surely affects his view of the
lender's likely collection practices.

546 F.2d at 456-57.

DeVincent clearly holds that a prior conviction for a

violent crime--even one wholly unrelated to the defendant's

lending activities--may, if known to a debtor, influence the

latter's reasonable expectations as to how the lender may

collect the loan. It is true that the ECT statute itself

permits reputation evidence--usually a reputation for

violence--in more restricted situations. See 18 U.S.C. 

892(c), 894(c). But these provisions do not explicitly bar

evidence of specific prior bad acts, as permitted under Fed.

R. Evid. 404(b), when offered to show the basis for a

victim's fear, and cases besides DeVincent have followed that

course. The weighing of prejudice against probative value is

otherwise largely for the trial court, see Fed. R. Evid. 403,

and no abuse of discretion has been shown here.

We next consider several general attacks on the RICO

convictions. The RICO statute makes it a crime for "any

person employed by or associated with any enterprise engaged

in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly,

-28- -28-

in the conduct of such enterprise's affairs through a pattern

of racketeering activity or collection of unlawful debt." 18

U.S.C. 1962(c). The district court gave the following

instruction on the meaning of "conduct or participate . . .

in the conduct of" an enterprise under the statute:

The term "conduct" and the term "participate in the
conduct of" an enterprise include the performance
of acts, functions or duties which are necessary to
or helpful in the operation of the enterprise. A
person may be found to conduct or to participate in
the conduct of an enterprise even though he is a
mere employee having no part in the management or
control of the enterprise and no share in the prof-
its.

In Reves v. Ernst & Young, 113 S. Ct. 1163 (1993), the

Supreme Court held that an outside accounting firm employed

by an enterprise was not subject to civil RICO liability

unless it "participate[d] in the operation or management of

the enterprise itself." Id. at 1173. Relying on Reves,

Oreto, Jr. and Petrosino argue that "mere employees" by

definition do not participate in the "operation or manage-

ment" of the enterprise. It is true that in Reves the Court

expressly declined to decide "how far 1962(c) extends down

the ladder of operations." 113 S. Ct. at 1173 n.9. Further,

the Court observed that "some part in directing the

enterprise's affairs is required." Id. at 1170.

Reves is a case about the liability of outsiders who may

assist the enterprise's affairs. Special care is required in

translating Reves' concern with "horizontal" connections--

-29- -29-

focusing on the liability of an outside adviser--into the

"vertical" question of how far RICO liability may extend

within the enterprise but down the organizational ladder. In

our view, the reason the accountants were not liable in Reves

is that, while they were undeniably involved in the

enterprise's decisions, they neither made those decisions nor

carried them out; in other words, the accountants were

outside the chain of command through which the enterprise's

affairs were conducted.

The government did not show that Oreto, Jr. or Petrosino

participated in the enterprise's decisionmaking; but they and

other collectors were plainly integral to carrying out the

collection process. Reves defines "participate" as "to take

part in," 113 S. Ct. at 1170, and nothing in the Court's

opinion precludes our holding that one may "take part in" the

conduct of an enterprise by knowingly implementing decisions,

as well as by making them. Indeed, the Court said that "[a]n

enterprise is `operated' not just by upper management but

also by lower-rung participants in the enterprise who are

under the direction of upper management." 113 S. Ct. at 1173

(emphasis added).

Congress declared in RICO that the statutory purpose was

"to seek the eradication of organized crime in the United

States" and Congress listed "loan sharking" as a means by

which "organized crime derives much of its power." See Pub.

-30- -30-

L. 91-452, 1 (Statement of Findings and Purpose following

18 U.S. C. 1961). RICO also provides expressly that

"collection of unlawful debt" is a predicate for RICO

liability. This conduct is precisely what the government

charged, and the jury found, was engaged in by the present

appellants. We think Congress intended to reach all who

participate in the conduct of that enterprise, whether they

are generals or foot soldiers.2

Appellants have also challenged a second aspect of the

RICO instructions. A defendant may violate RICO by

participating in either a "pattern of racketeering activity"

or "collection of unlawful debt." 18 U.S.C. 1962(c). The

racketeering prong of the statute requires, at a minimum, "at

least two acts of racketeering activity . . . ." 18 U.S.C.

1961(5). In this case, the predicate acts specified in the

indictment against Oreto, Jr. and Petrosino were conspiracies

to collect individual loans by extortionate means in

violation of 18 U.S.C. 894. See 18 U.S.C. 1961(1)(B)

(specifying violations of 18 U.S.C. 891-94 as valid

predicate acts under RICO).



2Appellants also claim prejudice from the district
court's failure to complete its explanation of the
"association with or employment by the enterprise" element of
1962(c) after an interruption. Appellants have not
explained how they were harmed by the omission and the
language apparently omitted would have been primarily helpful
to the government.

-31- -31-

Appellants objected to the trial court's instruction

that the jury could find a pattern of racketeering activity

if the appellants committed or aided and abetted the

commission of at least two of the specified racketeering

acts. Our court has observed that "[a]iding and abetting is

an alternative charge in every count, whether explicit or

implicit," United States v. Sanchez, 917 F.2d 607, 611 (1st

Cir. 1990) (internal quotations omitted), cert. denied, 499

U.S. 977 (1991), and it appears that most if not all courts

to consider the issue have held that a defendant may be

convicted of aiding and abetting a conspiracy. See, e.g.,

United States v. Gonzalez, 933 F.2d 417, 444-45 (7th Cir.

1991); United States v. Portac, Inc., 869 F.2d 1288, 1293

(9th Cir. 1989), cert. denied, 498 U.S. 845 (1990).

Oreto, Jr. and Petrosino also argue that because there

was only a single ECT statute conspiracy involving these

appellants, the government failed to prove the two predicate

acts necessary for a pattern of racketeering. 18 U.S.C.

1961(5). Contrary to appellants' hopes we do not see why the

possibility of a single ECT statute conspiracy (and it is

only that) should infect the RICO convictions. Quite apart

from other possible answers, we think it is enough that the

specific ECT statute conspiracies charged as predicate acts

of racketeering were each also conspiracies to make

extortionate loans or collect loans by extortionate means.

-32- -32-

This court has already held in Weiner that one such ECT

statute conspiracy is enough for a RICO violation because the

pattern requirement does not apply to the collection of

unlawful debt. Even if the jury had convicted only on a

single ECT statute conspiracy, the one charged in this case

happens to suffice under the alternative prong of RICO. 18

U.S.C. 1962(c). We need not consider whether a single

conspiracy shown to have embraced multiple acts of wrongdoing

might also satisfy the racketeering prong where unlawful debt

was not involved so that at least two racketeering acts were

required.

Confronting Weiner appellants argue that our

construction of section 1962(c) in Weiner renders the statute

unconstitutional. They say that requiring two predicate acts

for one theory of liability but only one for a different

theory violates the equal protection clause, apparently

because one defendant may be found guilty more readily than

another under the same statute. The statutory distinction

employs no suspect classification nor burdens a fundamental

right, so we must uphold the statute if the disparity is

"rationally related to the State's objective." Harrah

Independent School District v. Martin, 440 U.S. 194, 199

(1979) (per curiam).

Congress could rationally have decided that collections

of unlawful debt were central to the evils at which RICO was

-33- -33-

directed. Accordingly, it could rationally have chosen to

make guilt more easily provable in unlawful debt cases than

in cases involving other forms of racketeering activity.

Whether this rationale was the actual motivation for the

statutory distinction is irrelevant to our inquiry, see

Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466

(1981), although Congress' statement of purposes (quoted

above) gives some reason to believe that Congress did so

reason.

A due process argument advanced by appellants is equally

without merit. In essence, they appear to argue that the

"continuity plus relationship" test for a "pattern" under

section 1962(c) is so inherently vague as to be

unconstitutional. We rejected a similar argument in United

States v. Angiulo, 897 F.2d 1169, 1179-80 (1st Cir. 1990),

holding that any vagueness challenge to section 1962(c) must

show "that the meaning and scope of RICO's `pattern' element

was unclear and vague" as applied to the defendants' conduct

in the particular case. The appellants in the present case

have not even attempted such a demonstration.

Oreto, Jr. and Petrosino each challenge the sufficiency

of the evidence to support their convictions on various

counts of the indictment. Oreto, Jr. contends that there was

insufficient evidence to support the jury's guilty verdicts

both on the four counts of conspiracy to collect extensions

-34- -34-

of credit by extortionate means, 18 U.S.C. 894, and on the

RICO counts. He argues that the first two conspiracy counts-

-counts 10 and 14 of the indictment--cannot be sustained

because neither of the alleged victims testified and the

government failed to identify the voices on wiretap tapes

used to secure the convictions.

As to the wiretaps, both FBI Special Agent Gianturco and

Massachusetts State Trooper Thomas Foley testified to their

familiarity with the voices in question and identified the

speakers on the tapes for the jury. Further, the illegal

loans to Mario Singarella (count 10) and Gary Plotkin (count

14) were corroborated, by documentary evidence in the

loanshark organization's 'Bible'; Daniel Forte, a cooperating

co-conspirator, testified at trial as to Oreto, Jr.'s

involvement in efforts to collect each loan. The evidence

was more than sufficient.

Oreto, Jr. challenges his conviction on count 67 of the

indictment, involving extortionate collection of a loan to

Joseph Brangiforte, on the ground that Brangiforte failed to

identify Oreto, Jr. as the person Brangiforte repaid. There

was ample other evidence, however, that Oreto, Jr. was

involved with the Brangiforte loan: Brangiforte testified

that he made a payment to Oreto, Jr. near the Wonderland MBTA

station; the government produced wiretap recordings of

Brangiforte and Oreto, Jr. discussing the loan; and Trooper

-35- -35-

Foley testified that he saw Brangiforte give Oreto, Jr. an

envelope. Again, the evidence was sufficient. Brangiforte's

inability to pick out Oreto, Jr. in the courtroom was fodder

for jury argument, but is not in itself fatal to the

conviction. See United States v. Doherty, 867 F.2d 47, 67

(1st Cir.), cert. denied, 492 U.S. 918 (1989).

Oreto, Jr.'s challenge to count 16 presents a closer

question. That count involved extortionate collection of a

loan to Eleanor Kelley, and Oreto, Jr. claims his conviction

was improper because "[t]here was simply no evidence that

Eleanor Kelley . . . was in fear." The debtor's subjective

fear is not itself an element of the offense under 18 U.S.C.

894, although actual fear may be pertinent evidence. "[I]t

is the nature of the actions of the person seeking to collect

the indebtedness, not the mental state produced in the

debtor, that is the focus of the inquiry for the jury."

United States v. Polizzi, 801 F.2d 1543, 1548 (9th Cir.

1986). See generally 1 Sand, supra, 32.02, at 32-16.1.

Here, the government offered evidence that Oreto, Jr.

and two other strangers visited Kelley at her place of

business in order to ask Kelley to contact Oreto, Sr. about

the loan. The government also showed that the loan itself

was grossly usurious. After a reading of the testimony as to

the visit, we think that a reasonable jury could determine

that the nature of the loan, its interest rate, and the

-36- -36-

appellants' collection methods were not of the sort commonly

employed by legitimate lenders, and that the appellants'

tactics carried an implicit threat of violence.

Oreto, Jr. also argues that the government failed to

demonstrate that he "participated in the management or

control of the alleged enterprise" because the proof showed

only that he "was a mere collector for a short period of

time." There is no requirement that participation extend

over a long period. Here, the evidence showed that Oreto,

Jr. was directly involved in at least four transactions in

connection with his father's loansharking enterprise. The

evidence is sufficient to sustain both the substantive RICO

and RICO conspiracy convictions.

Petrosino also challenges his RICO convictions on

evidentiary grounds, contending that the government proved

only that he was "a collector paid $50 weekly for a bare five

months" and that this is insufficient to show that he

"participated in the operation or management of the

enterprise itself." The statute requires neither that a

defendant share in the enterprise's profits nor participate

for an extended period of time, so long as the predicate act

requirement is met. Petrosino participated in the collection

of seven separate loans by extortionate means. Those actions

are sufficient.

-37- -37-

Lastly, appellants objected at trial to the following

instruction given by the trial court to define the concept of

"reasonable doubt":

A reasonable doubt is a real doubt, based upon
reason and common sense after careful and impartial
consideration of all the evidence in the case. A
reasonable doubt does not mean beyond all doubt.
Rather it means a doubt based upon reason.

Appellants' challenge rests upon the Supreme Court's decision

in Cage v. Louisiana, 498 U.S. 39 (1990), which held to

equate reasonable doubt with an "actual substantial doubt"

was constitutionally inadequate. Arguing that "real doubt"

in the present instruction is equivalent to "substantial

doubt," appellants now argue that their convictions must be

reversed due to the faulty instruction. See Sullivan v.

Louisiana, 113 S. Ct. 2078 (1993) (erroneous instruction on

reasonable doubt cannot be harmless error).

The objection to the phrase "substantial doubt" is that

it is ambiguous. If taken to mean "large" or something like

it, the instruction may mislead the jury into thinking that a

small but reasonable doubt is no bar to conviction. But the

phrase would be "unexceptionable" if taken to mean that the

doubt must be "something more than a speculative one."

Victor v. Nebraska, 114 S. Ct. 1239, 1250 (1994). The term

used here, "real," is not subject to the same ambiguity; its

natural antonym is "unreal" or" imaginary," which are proper

descriptions of what would not be a reasonable doubt. Id. at

-38- -38-

1250. Boilerplate might be preferable, but there was no

error.

Affirmed.

-39- -39-